**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | | |
|---|---|---|
| AFFINITY LABS OF TEXAS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-00164-RC |
| | ) | |
| BMW NORTH AMERICA, LLC, *et al*. | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |
| | ) | |
| AFFINITY LABS OF TEXAS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08-00171-RC |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| ALPINE ELECTRONICS OF AMERICA, | ) | |
| INC., *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

Page

I.     CLAIM CONSTRUCTION STANDARD OF REVIEW ...................................................1

II.    PATENT BACKGROUND AND TECHNOLOGY ...........................................................2

       A.     Overview Of The Parent Application ................................................................ 2

       B.     Overview Of The '833 Invention ..................................................................... 3

       C.     Overview Of The Asserted Claims .................................................................. 8

III.   DISPUTED TERMS ......................................................................................................8

       A.     Claim Terms For Which Affinity Proposes Constructions ............................... 9

              1.     Claim Terms Related To The Descriptive Information That Is
                     Related To An Audio File ...................................................................... 9

                     a.     "Graphical User Interface" (Claims, 1, 17 & 28).......................9

                     b.     "Preprogrammed soft buttons that are linked to
                            respective audio information sources" (or just
                            "preprogrammed soft buttons," as proposed by
                            Defendants) (1, 17 & 28).................................................13

                     c.     "Name" / "To associate the audio file with a name"
                            (1, 17 & 28)......................................................................18

                     d.     "To select an available audio file for processing"
                            (17 & 28)..........................................................................22

              2.     Terms Related To Physical Structures ................................................ 25

                     a.     "Mount" (28) ...................................................................25

                     b.     "Portable electronic device" (1, 17 & 28)........................29

                     c.     "Firmware" (29)...............................................................34

       B.     Claim Phrases that Need Not Be Construed But Proposed for
              Construction by Defendants................................................................ 36

              1.     "Configured to Communicate ..." Phrases (1, 17 & 28) ................... 36

              2.     "Interface information"  (1 & 17)........................................................ 39

## <u>TABLE OF AUTHORITIES</u>

Page

*BridgeLux, Inc. v. Cree, Inc.*, 2008 U.S. Dist. LEXIS 43821 (E.D. Tex. June 3, 2008) ......... 22-23

*Candela Corp. v. Palomar Med. Techs., Inc.*, 2008 U.S. Dist. LEXIS 59860 (E.D. Tex., Aug. 6, 2008) .......................................................................................................14, 20

*Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366 (Fed. Cir. 2008)..........................33

*Embrex, Inc. v. Service Engineering Corp.*, 216 F.3d 1343 (Fed. Cir. 2000) ..............................23

*Grantley Patent Holdings, Ltd v. Clear Channel Comms., Inc.,* 2008 U.S. Dist. LEXIS 1588 (E.D. Tex. Jan. 8, 2008) ..................................................................................38

*Iovate Health Sciences, Inc. v. Bio-Engineered Supplements & Nutrition, Inc.*, 2008 U.S. Dist. LEXIS 44269 (E.D. Tex. June 5, 2008) ........................................................28

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ...............................................9, 14, 20, 24

*Sandisk Corp., v. Memorex Prods., Inc.*, 415 F.3d 1278 (Fed. Cir. 2005) ...................................29

*Seoul Semiconductor Co. Ltd. v. Nichia Corp.*, 596 F. Supp. 2d 1005 (E.D. Tex. 2009) ..............1

*SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870 (Fed. Cir. 2004) ................................23

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997)....................................20, 39

*Vitronics Corp. v. Conceptronic*, 90 F.3d 1576 (Fed. Cir. 1996)........................................... 28-29

Pursuant to P. R. 4-5(a) and the Court's March 26, 2009 Scheduling Order, Plaintiff

Affinity Labs of Texas, LLC ("Affinity") hereby submits its Opening Claim Construction Brief.

The patent-in-suit in both of the above-captioned matters is U.S. Patent No. 7,324,833 (the "'833

Patent"), entitled "System and Method for Connecting a Portable Audio Player to an Automobile

Sound System."  The inventors of the '833 Patent are Russell W. White and Kevin R. Imes.

Because the claim construction issues relating to the '833 Patent are identical in the above-

captioned matters, Affinity is filing the same brief in both cases.

## I.     CLAIM CONSTRUCTION STANDARD OF REVIEW

Governing Law.  The governing legal standards relating to claim construction are

described, for example, in the Court's opinion in *Seoul Semiconductor Co. Ltd. v. Nichia Corp.*,

596 F. Supp. 2d 1005 (E.D. Tex. 2009), and are hereby incorporated by reference.

Level of Ordinary Skill in the Art.  The "Field of the Disclosure" of the '833 Patent is

described generally as "an audio system and method."  ('833 Patent, 1:14-15).  The detailed

description of the invention and the '833 claims draw on a combination of skills.  Affinity

submits that a person of ordinary skill in the art covered by the '833 Patent would have a 4-year

degree in Electrical Engineering (EE), Mechanical Engineering (ME), or Computer Science

(with course work in or a working understanding of EE and/or ME), and at least 2 years'

experience designing electronic devices with human interfaces, including integration of

components for such devices and experience with digital media and communication networks.

This description is consistent with the disclosures of the specification, as discussed in more detail

below.  This description is also consistent with the backgrounds of the named inventors as of

March 28, 2000 (*i.e.*, the priority date of the application that matured into the '833 Patent).  (*See*

Declaration of Russell W. White and Declaration of Kevin R. Imes, attached as Exhs. A and B).

## II.    <u>PATENT BACKGROUND AND TECHNOLOGY</u>

### A.    Overview Of The Parent Application

The '833 Patent was issued from a continuation application claiming priority to Application No. 09/537,812 (the "'812 Application"), filed on March 28, 2000. (*See* '833 Patent, "Related U.S. Application Data"). The '812 Application separately ripened into U.S. Patent No. 7,187,947. (Attached as Exh. C). The '812 Application also supports two other patents that have issued with the identical specification (U.S. Patent Nos. 7,440,772 and 7,486,926, attached as Exhs. D and E), and Affinity has several other continuation applications pending before the Patent Office that claim priority to the '812 Application.

The '812 Application broadly addresses the problem of accessing, managing, and communicating digital audio and video content. As reflected in the number of patents that have already issued, the '812 Application describes a pioneering vision of the use of digital media. While the iPod portable digital media player is now ubiquitous, the '812 Application was filed well before the iPod came into existence. *See* Kahley, Leander, *Straight Dope on the iPod's Birth*, Wired News, October 17, 2006 (attached as Exh. F). Prior to any conception, research or development of the iPod, the '812 Application described the integrated "ecosystem" that consumers now associate with iPods, iTunes, iPhones, and the products and systems that work with them, including:

- an online digital media store (*e.g.*, the present-day iTunes online store);

- a software application at a personal computer through which a user can purchase and download music and other files from the online store, create playlists, and customize the names associated with the audio files (*e.g.*, the present-day iTunes application software);

- a portable electronic device that can download, store and play those audio files and display the associated descriptive information via a wireline connection to the personal computer (*e.g.*, the iPod) or a wireless connection to the online store (*e.g.*, the iPod Touch);

2

- a portable electronic device that can also serve as cellular telephone and personal digital assistant (*e.g.*, the iPhone); and

- a separate electronic device (such as a car stereo) that can be interconnected with the portable electronic device and can separately display the menu information from the handled device so that a user can select a particular audio file on the handheld device for playback (*e.g.*, the accused devices in this case).[1]

As described in more detail below, the specific invention claimed in the '833 Patent is part of this larger ecosystem and is focused primarily on the last three points listed above:  the seamless integration and use of a portable electronic device within an automobile.

### B.   Overview Of The '833 Invention

The '833 Patent has 35 claims, three of which are independent claims (1, 17, and 28). The '833 claim set generally relates to a system for locating and accessing a digital audio file (*e.g.*, a song or a playlist) that is stored at a particular "source."  The specific "source" of the audio files in the claims of the '833 Patent is the memory on a "portable electronic device."  The two primary physical components of the '833 claims are:  (i) a <u>portable electronic device</u> (*e.g.*, a handheld MP3 player or cell phone) and (ii) a <u>separate electronic device</u> (*e.g.*, a car stereo).  The portable electronic device has a memory to store audio files and a display that can present a graphical user interface that allows a user to navigate though the songs stored in the memory. The separate electronic device (*e.g.*, the car stereo) can display a menu of the titles associated with particular audio files stored on the portable electronic device.  These two devices work

---

[1]    Reflective of the pioneering nature of the '812 Application are Apple's numerous iPod-related patent filings in this space, all of which postdate the '812 Application priority date by years.  (*See*, *e.g.*, Application No. 11/515,270, "Media Data Exchange, Transfer or Delivery For Portable Electronic Devices" filed 9/1/06 (4/25/03 is earliest possible effective filing date); Application No. 11/114,914, "Publishing, Browsing, Rating and Purchasing of Groups of Media Items," filed 4/25/05 (7/16/02 is earliest possible effective filing date); Application No. 11/620,669, "Apparatuses and Methods that Facilitate the Transfer of Power and Information Among Electrical Devices," filed 1/6/07; Application No. 11/598,952, "Personal Media Devices With Wireless Communication," filed 11/13/06) (excerpts attached as Exhs. G, H, I, and J).

together to allow the user to use the knobs and buttons of a car stereo to navigate through the menu presented on the car's display and, in the process, access and play the audio files stored on the portable electronic device.

The specification of the '833 Patent begins by describing the process through which audio content (*e.g.*, a song) and information relating to that content (such as data representing the name associated with that song) can be communicated from an online website or personal computer to a portable electronic device. *See*, *e.g.*, '833 Patent, 3:35-52. This relates to the first two points of the larger "ecosystem" described above, which are not claimed in the '833 Patent but which provide background context.[2]

Turning to the focus of the '833 Patent, the specification describes the versatility of the portable electronic device ("electronic device 300" in this example), including its ability to connect to various separate devices, and the ability of other devices (such as a car stereo) to control it in a manner that maintains safe driving fundamentals:

> As a removable device, electronic device 300 may also be coupled to a home audio system, a portable radio system or other systems thereby providing a versatile electronic device operable to receive wirelessly communicated selected audio information.
>
> In another embodiment, electronic device 300 may be operable as a PDA and/or a cellular phone that may be mounted to an automobile's console. Electronic device 300 may then integrate with a user's automobile to provide an all-encompassing communications device. For example, electronic device 300 configured as a PDA and cellular phone may allow for communication with a user's email account, voice mail account, the Internet, as well as allowing for the receipt of selected audio information via wireless communication. Electronic device 300 may be operable in a hands-free mode allowing a user to maintain safe driving fundamentals. During use, electronic device 300 may be processing selective audio information for

---

[2]        While the specification describes embodiments where the portable electronic device receives audio information via wireless communications, it makes equally clear that wireline connections may be substituted, such as a portable MP3 player receiving audio files from a personal computer via a cable. (*See* '833 Patent, 15:25-30, 18: 10-15).

communicating with an automobile audio system and may further be operating to receive incoming cellular calls.

('833 Patent, 9:31-51).

The two primary physical components of the '833 claim set (the portable electronic device and the separate electronic device) are configured such that a user of the separate electronic device (*e.g.*, a user of a car stereo) can connect the portable electronic device to the separate electronic device.  Examples of such a connection are described as follows:

> FIG. 5B illustrates automobile console having a mount for coupling an electronic device according to one aspect of the present invention.  Console 510 includes mount 511 operable to receive electronic device 512.  Mount 511 may be located in many different locations within an automobile such as coupled to a sun visor, center console, dashboard, floorboard, etc.  Mount 511 allows the user to couple electronic device 512 to the automobile and provide an interface for communication between electronic device 512 and the automobile audio system. . . .  During operation, electronic device 512 coupled to mount 511 may receive selected audio information via wireless communication and communicate the selective information to the automobile audio system.

('833 Patent, 12:20-37).  This was likewise explained during the prosecution history:

> Moreover, in the automobile-centric embodiment of Figure 9, a wireline connection is shown as the communication medium between two electronic devices – namely, a portable electronic device and an automobile sound system component.  In Figure 9, "[e]lectronic device 907 may . . . communicate with the [car's sound] system via interface cable . . .  911."  [0092].  As such, "information communicated to electronic device 907 may be transferred to [the car's sound] system 901 such that a user may listen to selected audio information."  [0092].

(Exh. K, 7/6/07 Response to Office Action, at 10).

Once the portable electronic device (*e.g.*, a handheld MP3 player) and the separate electronic device (*e.g.*, a car stereo) are interconnected via a mount, the separate electronic device can display a menu of descriptive information associated with audio files stored on the portable electronic device.  This menu is presented on the separate electronic device (*e.g.*, the

5

display of a car stereo) as a graphical user interface ("GUI"), and the user can navigate through

the GUI.  The use of GUIs is introduced by the specification as follows:

> FIG. 4 illustrates a graphical user interface (GUI) for displaying selectable audio
> information according to one aspect of the present invention.  The GUI may be
> operable with a computer system, cellular device, PDA, or other electronic devices or
> systems operable to display the GUI of FIG. 4.

('833 Patent, 10:1-6).

The GUI on the separate electronic device contains what the claims refer to as "a

plurality of preprogrammed soft buttons that are linked to respective audio information sources."

(*Id.*, claims 1, 17 and 28).  The specification's example of preprogrammed soft buttons within a

GUI is referred to as "Radio dial 412," as depicted in Figure 4 and described in the text of the

specification.  The specification explains that Radio dial 412 can be preprogrammed to include

selectable graphics representing playlists, audio files, and other audio information:

> [R]adio dial 412 surpasses the limitations of conventional systems through providing a
> programmable radio dial of user customized audio information.  Radio dial 412 includes
> several stations that may be programmed using program interface 413.  The preset
> stations may include several different types of user customized preset information such as
> user selected playlists, Internet broadcast stations, top lists, group playlists, artist-selected
> lists, Internet radio station, conventional radio stations, Internet phone, cellular phone,
> etc. and other functions, features, or information associated with audio information.

(*Id.* at 11:17-27).  The specification further explains that a selectable graphic that is

representative of the same information – shown as part of radio dial 412 – can be used by

different electronic devices:

> Radio dial 412 may also be displayed as a separate user interface and in some
> embodiments, does not require a "browsing" environment to view radio dial 412.  For
> example, an electronic device, such as a PDA, having a display may graphically present
> radio dial 412 to a user.  One example may be using electronic device in association with
> an automobile audio system.  Electronic device may display radio dial 412 and may allow
> a user to navigate, modify, select, adjust volume, access daytimer, access phone lists, etc.
> or perform [other] functions while the electronic device is used in association with an
> automobile sound system.  Therefore, radio dial 412 may be operable as an application
> for use with several different types of electronic devices (*i.e.*, computer systems, portable

computing devices, cellular phones, etc.) operable to display radio dial 412 and in some embodiments may be wirelessly communicated to an electronic device.

('833 Patent, 11:28-44).  The ability to navigate through selectable graphics and select audio content on both the portable device and the separate device was also explained in the prosecution history:

> In practice, a graphical interface item (which could be, for example, Radio dial 412 of Fig. 4) includes a name that is associated with a given audio file.  The graphical interface item can be viewed on the display of a first electronic device (e.g., the portable electronic device).  And, at least some part of the graphical interface item can be viewed on a display of a different electronic device (e.g., a car stereo).  As explained in the Specification, providing a graphical interface of music choices that can be shown on displays of several different types of electronic devices allows a user to be familiar with and to comfortably navigate through and select songs from the different types of devices – even in an automobile environment.  Moreover, as claimed in pending claim 50, elements of a given graphical interface may be "preprogrammable" – allowing the user to customize the display that appears on various electronic devices.

(Exh. L, 3/19/07 Response to Office Action at 9).  The descriptive information about the audio file is <u>shared</u> by both the portable electronic device and the separate electronic device, and is linked to the same source.  In other words, regardless of whether a soft button representative of a given name is selected from the portable electronic device or the separate electronic device, it is linked to the same audio file stored on the portable electronic device:

> Radio tab 406 may also be provided for displaying audio information. . . .  A search engine may be provided allowing a user to search for a specific type of audio information such as an artist, song title, genre, and Internet radio stations, etc.  …  A user may also use a select a device feature that allows a user to select a destination device for communicating selected audio information.  For example, a user may want to communicate a playlist to several different devices such as a PDA, a home computer system, a work computer system, etc.
>
> As such, a user can communicate selective information to several devices without having to download the information separately for each device.

('833 Patent, 10:48-64).

### C.    Overview Of The Asserted Claims

Affinity has asserted the following claims of the '833 Patent against the Defendants in the 164 case:  claims 11, 14, 18, 22, 24, 28, 29, 34 and 35.  In addition to those claims, Affinity has also added claims 17 and 19 to the 171 case.[3]  Because there are no unique claim construction issues presented by the additional claims in the 171 case, the claim construction issues are identical across all parties and all cases.

### III.    <u>DISPUTED TERMS</u>

Although the chart of disputed claim terms submitted as part of the Joint Claim Construction and Prehearing Statement ("JCCPS") is fairly lengthy, Affinity has organized the disputed terms into discrete categories in an attempt to narrow the issues and crystallize the disputes as follows.

<u>First</u>, Affinity will address the terms it believes should be construed by the Court, and those terms fall broadly into two categories:  (i) claim terms related to the descriptive information that is related to the audio files stored on the portable electronic device (*i.e.*, "graphical user interface," "preprogrammed soft buttons," and "name") and the use of that descriptive information to select an audio file stored on the portable electronic device ("to select an available audio file for processing"); and (ii) claim terms related to the physical components recited in the claims.

<u>Second</u>, Affinity will address claim terms that Affinity and the Volkswagen Defendants believe are not in need of construction, but that the other Defendants seek to construe in order to incorporate limitations that Affinity believes are not warranted.

---

[3]    The claim set asserted against each Defendant varies slightly based on whether or not the accused systems have touch screen displays (claim 22) and whether the accused portable electronic device constitutes a cellular telephone (claim 18).

As shown below and in the JCCPS, the parties have presented the Court with three positions on each claim term:  (i) Affinity's position; (ii) the position of all Defendants except the Volkswagen Defendants; and (iii) the position of the Volkswagen Defendants.  In order to anchor the discussion of each term, Affinity will begin each discussion with a chart that presents the three positions.  For each disputed claim term, Affinity will proceed through the claim language, the specification, and the prosecution history, in the manner directed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).

**A.**      **Claim Terms For Which Affinity Proposes Constructions**

   **1.**      **Claim Terms Related To The Descriptive Information That Is Related To An Audio File**

As recited in the claims, the descriptive information relating to an audio file breaks down into three categories (which can be thought of as 3 "tiers"):

- "Name":  A title that identifies an audio file or files (*e.g.*, the name of a song or a playlist of multiple songs) is stored in the memory of the portable electronic device.

- "Preprogrammed soft buttons":  Each name is represented in a selectable graphic (*i.e.*, a "preprogrammed soft button") that can be presented on a display.  Each soft button is "linked" to an audio file saved in the memory of the portable electronic device.

- "Graphical user interface":  A graphical user interface ("GUI") is a presentation of selectable graphics (such as, preprogrammed soft buttons) that permits a user to navigate through and select audio files for playing.

Each of these three claim terms will be addressed separately below.

   **a.**      **"Graphical User Interface" (Claims 1, 17 & 28)**

| Affinity's Construction | Defendants' Construction | Volkswagen's Construction |
|---|---|---|
| A presentation that contains selectable graphics (for example, text or icons). | A display for presenting information in a graphical form to enable a user to interact with a device. | Volkswagen joins in Defendants' proposed construction. |

9

All parties agree that this term needs to be construed.  The disputes appear to be (i) whether the graphical user interface is a "presentation" (as proposed by Affinity) or a "display for presenting information" (as proposed by all Defendants); and (ii) whether additional detail regarding the term "graphic" is appropriate in this construction.

<u>Claim Language</u>.  On the first issue ("presentation" versus "display"), Affinity contends that the claim language makes clear that the graphical user interface is a presentation made on a display screen, and is <u>not</u> the physical device that does the displaying (*e.g.*, the display screen itself).  Indeed, each of the independent claims identifies the portable electronic device and the separate electronic device as devices having a physical "display" – which is expressly recited as a structural component of both devices.  The presence of the claimed "display" in both devices makes clear that the "display" is a different claim element than the "graphical user interface" presented on the "display."  *See* claims 1, 17, and 28.  As a corollary, the independent claims make clear that the selectable graphics representing descriptive information about audio files "is presented on the associated display [of the separate electronic device] in a graphical user interface" supporting Affinity's proposed construction of GUI to mean *a presentation that contains selectable graphics (for example, text or icons)*.  (*See* claim 28; *see also* claim 1 ("allow a user to view at least a partial representation of a graphical user interface that includes the graphical interface item on the associated display") and claim 17 ("allow the user to view the graphical menu on the associated display in a graphical user interface")).

On the second issue (the meaning of the term "graphic" or "graphical"), the claim language itself makes clear that the GUI can present, for example, text that can be selected.  In defining what constitutes a graphical user interface, Affinity seeks to clarify the meaning of "graphic" because it is apparent from other constructions proposed by Defendants (except

10

Volkswagen) that those Defendants seek to read into the term "graphic" restrictions requiring the particular graphical representation of descriptive information relating to audio files to look exactly the same on both devices.  Defendant's construction is not called for and, indeed, is contradicted by the intrinsic record.

The claim language demonstrates that text alone is sufficient to constitute a graphic. Specifically, claim 17 requires the association of a name (*i.e.,* descriptive information) with an audio file and explains that the portable electronic device must be configured to "communicate a collection of information comprising the name to a different electronic device" such that the user can interact with the separate electronic device "to view at least a portion of the graphical menu on the associated display, wherein the portion comprises the name. . . ."  Likewise, claim 28 recites that the portable electronic device is configured "to communicate a collection of information comprising the name to the electronic device" and the separate electronic device "is configured to receive the collection of information and to present the partial representation of the menu on the associated display, further wherein the partial representation of the menu is presented on the associated display in a graphical user interface. . . ."  In short, the name – or any representation of the name – is recited as a component of the GUI, and is therefore sufficient to constitute a graphic.

Specification.  The specification explains the role of the GUI: "FIG. 4 illustrates a graphical user interface (GUI) for displaying selectable audio information according to one aspect of the present invention."  ('833 Patent, 10:1-3).  Thus, the graphical presentation may simply be a presentation of selectable audio information (*e.g.*, a representation of the names recited in the claims).  Likewise, the specification makes clear that the GUI is not limited to any particular software or protocol:  "The present invention is not limited to any one specific type of

software and may be realized in [a] plurality of ways as can be appreciated by those skilled in the art."  (*Id.* at 10:17-19).  This again confirms that (i) the GUI is a presentation and not the physical device on which the presentation is displayed, and (ii) the GUI does not have to take any particular form or format.[4]

Prosecution History.  The concept of a GUI is repeatedly referred to throughout the prosecution as presenting a "graphical item" that can be a representation of the name of the audio file.  The Applicants explained:

> In practice, a graphical interface item (which could be, for example, Radio dial 412 of Fig. 4) includes a name that is associated with a given audio file.  The graphical interface item can be viewed on the display of a first electronic device (e.g., the portable electronic device).  **And, at least some part of the graphical interface item can be viewed on a display of a different electronic device (e.g., a car stereo).**

(*See* Exh. L, 3/19/07 Response to Office Action, at 9) (emphasis added).  The Examiner's next Office Action confirmed that understanding:

> [All pending independent claims] disclose a portable electronic device displaying **a graphical interface item comprising a name** associated with an audio file wherein the portable electronic device is communicatively coupled to a different electronic device and the portable electronic device communicates a representation of the graphical interface item to the different electronic device for display on said different electronic device.

(*See* Exh. M, 5/22/07 Office Action, at 2-3) (emphasis added).  The Applicants' response to that Office Action again confirms this understanding:

> The Examiner suggests that the specification does not teach or suggest the existence of a graphical interface item that:  (1) links a name to an audio file; and, (2) is communicated to and used by different devices.
>                                        ***
> Radio dial 412 is one example of a relatively complex graphical interface.  Other graphical interfaces may not need to be as complex.  As mentioned in the specification

---

[4]     Consistent with Affinity's proposed construction, claim 11 of the related '926 Patent is explicit regarding the meaning of the term "soft button," reciting the presentation of "a soft button comprising the user-defined name on an associated display of the different audio system." (*See* Exh. E, at claim 11).

quotes presented below, radio dial 412 includes user-defined names that are linked to available audio sources such as playlists of stored MP3 files.

***

As shown, the display of system 901 is not large enough to present an entire version of radio dial 412 and instead only presents a portion of the dial – **namely, the user defined name 98.1**.

(See Exh. K, 7/6/07 Response to Office Action, at 8-10) (emphasis added).  In short, the prosecution history confirms that the textual numbers "98.1" shown in Figure 9 and described in the specification are sufficient to constitute a representation of a name, which is sufficient to constitute a graphic displayed in the GUI.

> b.    "Preprogrammed soft buttons that are linked to respective audio information sources" (or just "preprogrammed soft buttons," as proposed by Defendants) (1, 17 & 28)

| Affinity's Construction | Defendants' Construction | Volkswagen's Construction |
|---|---|---|
| Selectable graphics that each represent a preprogrammed name associated with a particular audio file saved in the memory of the portable electronic device and are linked to that audio file. | Software-rendered graphical buttons created by the user to customize the display. | "Soft buttons" are simulated buttons, or physical buttons that serve different functions at different times. "Preprogrammed soft buttons" are soft buttons, the display of which has been customized by the user. |

Affinity seeks to construe the phrase "preprogrammed soft buttons that are linked to respective audio information sources," while Defendants only seek to construe the term "preprogrammed soft button."  The Volkswagen Defendants have a different proposal for the term "preprogrammed soft button" than the other Defendants.  All parties appear to agree, however, that a "preprogrammed soft button" is a software-rendered "button," and that it appears in the GUI presented on the display of an electronic device.  That said, the parties appear to dispute the role of "customization" by the user.  Moreover, Affinity has construed the term in the context of its surrounding language to provide context and confirm the linkage of the soft button to the audio file as required by the claim language.

13

Claim Language.  The claim language makes clear that the "preprogrammed soft buttons" are selectable graphical representations of the names associated with the audio files saved in the memory of the portable electronic device.  (*See*, *e.g.*, independent claims 1, 17, and 28).

On the issue of customization, there is no requirement anywhere in the claims of the '833 Patent that the user <u>must create</u> the particular graphic associated with a soft button, and it is improper to read such a limitation into the claims.  *Candela Corp. v. Palomar Med. Techs., Inc.*, 2008 U.S. Dist. LEXIS 59860, at *14-*15 (E.D. Tex., Aug. 6, 2008) (Clark, J.) ("It is axiomatic that courts should avoid importing limitations from the specification into the claim terms, absent a clear disclaimer of claim scope.") (citing *Phillips*, 415 F.3d at 1323).  As described below, the specification and prosecution history disclose that elements of the soft button may be customized, but there is no requirement that a user actually customize the button for it to qualify as a "preprogrammed soft button" in an accused device.  Moreover, the claim term "preprogramm<u>ed</u>" is in the <u>past tense</u> – *i.e.*, that by the time the soft button is presented in a GUI on the separate electronic device, the programming relating to that soft button (whether done by the user or by some other entity) has already occurred.

With respect to the remainder of the language in this phrase, the claim language explicitly states that each preprogrammed soft button must be respectively linked to an audio source, such as an audio file, stored on the portable electronic device.  The only device recited in the claims that has a memory is the portable electronic device and each independent claim requires that the audio files be saved in that memory, *i.e.*, the memory of the portable electronic device.  (*See* independent claims 1, 17 and 28).  Simply put, there is no other source for audio files recited in any claim other than the memory on the portable electronic device.

14

Specification.  The example showing "preprogrammed soft buttons" in the specification is "Radio dial 412," which appears in Figure 4.  The specification describes Radio dial 412 as follows, making clear that the selectable buttons on the display can be associated with an audio file (or even other information) and, if desired, can be customized by a user; and that it allows the same descriptive information to be shared by multiple devices:

> However, radio dial 412 surpasses the limitations of conventional systems through providing a programmable radio dial of user customized audio information.  Radio dial 412 includes several stations that may be programmed using program interface 413.  The preset stations may include several different types of user customized preset information such as user selected playlists, Internet broadcast stations, top lists, group playlists, artist-selected lists, Internet radio station, conventional radio stations, Internet phone, cellular phone, etc. and other functions, features, or information associated with audio information.

> Radio dial 412 may also be displayed as a separate user interface and in some embodiments, does not require a "browsing" environment to view radio dial 412. For example, an electronic device, such as a PDA, having a display may graphically present radio dial 412 to a user.  One example may be using electronic device in association with an automobile audio system.  Electronic device may display radio dial 412 and may allow a user to navigate, modify, select, adjust volume, access daytimer, access phone lists, etc. or perform [other] functions while the electronic device is used in association with an automobile sound system.  Therefore, radio dial 412 may be operable as an application for use with several different types of electronic devices (i.e., computer systems, portable computing devices, cellular phones, etc.) operable to display radio dial 412 and in some embodiments may be wirelessly communicated to an electronic device.

('833 Patent, 11:17-44).

Likewise, the Abstract of the '833 Patent explains that the portable electronic device (referred to as just the "electronic device" or the "portable MP3 player" in the Abstract) is where the audio file is stored, and the separate electronic device (referred to as the "automobile sound system" in the Abstract) is able to select an audio file stored on the portable electronic device for playing and output though the automobiles' speakers:

> In one embodiment, the electronic device may be a portable MP3 player.  The system may also include a processor or playlist engine that can maintain a first playlist and a second playlist.  In practice, the first playlist may include a selection of audio content

having **a corresponding audio file saved in the memory of the electronic device.**  In one embodiment, the system may also include an automobile having an automobile sound system that has a speaker and an in dash sound system component, which may be removably coupled to the electronic device via a cable.  The in dash sound system component may have a selector, which may be, for example, a button, that allows a user to select the first playlist for outputting via the speaker.

('833 Patent, Abstract) (emphasis added).

Prosecution History.  The prosecution history again confirms three things:  (1) the "preprogrammed soft button" is a representation of the name of an audio file that is presented as a selectable graphic; (2) if there is any customization, it occurs before the soft button is communicated to the separate electronic device; and (3) the "preprogrammed soft button" is linked to the audio files saved on the portable electronic device.  Thus, the claimed portable electronic device and the separate electronic device both have soft buttons that link to the same source, specifically, audio files stored on the portable electronic device.

During prosecution of the '833 Patent, Affinity distinguished the prior art "Looney" patent reference by arguing that "Looney does not disclose any technique or selector, let alone a 'button selector' coupled to the automobile sound system, for selecting an audio content file that is stored in a portable electronic device." (*See* Exh. N, 11/27/06 Response to Office Action, at 15).  The Examiner's rejection of this distinction pointed out that "it is inherent for an automobile sound system to include buttons to allow control of music playback (*i.e.*, volume button, on/off button, etc.).  . . .  Further, claims 25, 34 and 35 allude to the button being on the portable electronic device and not on the actual in dash sound system." (*See* Exh. O, 2/27/07 Office Action, at 7).  In response, Affinity submitted entirely new claims, and explained:

In practice, a graphical interface item (which could be, for example, Radio dial 412 of Fig. 4) includes a name that is associated with a given audio file.  The graphical interface item can be viewed on the display of a first electronic device (e.g., the portable electronic device).  And, **at least some part of the graphical interface item** can be viewed on a display of a different electronic device (e.g., a car stereo).  As explained in the

16

> Specification, providing a graphical interface of music choices that can be shown on displays of several different types of electronic devices allows a user to be familiar with and to comfortably navigate through and select songs from the different types of devices – even in an automobile environment.  Moreover, as claimed in pending claim 50, elements of a given graphical interface may be "preprogrammable" – **allowing the user to customize the display that appears on various electronic devices**.

(*See* Exh. L, 3/19/07 Response to Office Action, at 9) (emphasis added).  Affinity thus explained two things:  (i) the two electronic devices can present on their respective displays selectable graphical representations for the same audio file, and (ii) the term "preprogrammable" means, at most, that the user is able to customize the information represented by a particular soft button on the portable device prior to that information being shared with other electronic devices.  In response to a subsequent written description rejection from the Patent Office, Affinity explained:

> Radio dial 412 is one example of a relatively complex graphical interface.  Other graphical interfaces may not need to be as complex.  As mentioned in the specification quotes presented below, radio dial 412 includes user-defined names that are linked to available audio sources such as playlists of stored MP3 files.  Radio dial 412 was specifically described as a customizable user interface application that can be communicated to and used by several different types of electronic devices.

(Exh. K, 7/6/07 Response to Office Action, at 9).  Thus, the name remains the same and the audio file remains the same; the graphical representation of the name and the device on which it is presented can be different.  Affinity also explained that the selected music is communicated from the portable electronic device to the automobile sound system, and specifically relied on the disclosure in which the music is selected for playing via the automobile display and then communicated from the portable electronic device to the automobile system:

> Moreover, in the automobile-centric embodiment of Figure 9, a wireline connection is shown as the communication medium between two electronic devices – namely, a portable electronic device and an automobile sound system component.  In Figure 9, "[e]lectronic device 907 may . . . communicate with the [car's sound] system via interface cable . . . 911." [0092].  As such, "information communicated to electronic device 907 may be transferred to [the car's sound] system 901 such that a user may listen to selected audio information." [0092].  As shown, the display of system 901 is not large enough to present an entire version of radio dial 412 and instead only presents a portion of the dial – namely, the user defined name 98.1.

17

(*Id*. at 10).  As evident from the prosecution history, the audio files of the claimed invention were stored on and played from the portable electronic device, and the information used to generate graphical interface items was transferred to a second device to allow the user to interact with the second device to select an audio file stored on the portable electronic device. The remaining exchanges in the prosecution history further confirm this.  (*See* Exh. P, 8/14/07 Office Action, at 3).

c.    "Name" / "To associate the audio file with a name" (1, 17 & 28)

| | "Name" | |
|---|---|---|
| **Affinity's Construction** | **Defendants' Construction** | **Volkswagen's Construction** |
| A title that identifies an audio file or plurality of audio files to a user; for example, a playlist, song, artist, or album. | Does not require construction. | Does not require construction. |

| | "To associate the audio file with a name" | |
|---|---|---|
| **Affinity's Construction** | **Defendants' Construction** | **Volkswagen's Construction** |
| See above for construction of "name".  Affinity believes the remaining terms do not require construction. | To create a link between the audio file and a name. | Volkswagen joins in Defendants' proposed construction. |

Affinity seeks a construction of the term "name" because – as shown above – the term "name" is an important conceptual anchor for the 3-tier system of identifying and presenting the descriptive information about an audio file as selectable graphics.  It is not clear that there is any substantive disagreement about Affinity's proposed construction of "name"; instead, Defendants appear to believe that the term is clear enough without construction.  Given the importance of the

term for the jury to understand the claimed invention – and given the role it will play in understanding other terms in the claim (including the distinction between a "name" and a "soft button," for example) – Affinity believes it would be helpful to construe this claim term.

The key point of Affinity's construction is that a name is simply the title that identifies an audio file, and it is distinct from any particular representation of that name.  In other words, the claims contemplate that the graphical representation of the name can slightly vary on the different displays (*e.g.*, a partial representation).[5]  However, the thing being represented – *i.e.*, the name – is the same.

Affinity and Defendants disagree about the import of the phrase "to associate the audio file with a name."  Affinity believes that the language means exactly what it says – an audio file (*e.g.*, the 0's and 1's that constitute a digital representation of a song stored in the memory of the portable device) is associated with a name (*e.g.*, a title).  Defendants' construction would require – in defiance of the claim language – that the portable electronic device "create a link" between the name and the audio file.  However, a "link" is recited in the claims as something different – a link is recited as the connection between a selectable graphic (*i.e.*, a "soft button") and a particular memory location (*i.e.*, a "source"), as described above.  The link is what allows the user to select and then hear an audio file, and that comes later in the claim; the term "associate the audio file with a name" means nothing more than what it says, *i.e.*, that there is an association

---

[5]     Indeed, the independent claims of the '833 Patent confirm that the descriptive information in a given selectable soft button may slightly vary between the two devices, as long as some portion of the descriptive information associated with the audio file(s) is graphically presented.  (*See*, *e.g.*, "view at least a partial representation of a graphical user interface" (claim 1), "view at least a portion of the graphical menu" (claim 17), "view at least a partial representation of the menu" (claim 28)).

in memory between an audio file and a name for that audio file.[6]  Likewise, the verb "to create"
has no basis in the claim language.[7]  *See Candela Corp. v. Palomar Med. Techs., Inc.,* 2008 U.S.
Dist. LEXIS 59860, *12-*13 (E.D. Tex. Aug. 6, 2008) (Clark, J.) (declining to construe
unambiguous claim term because the defendant "does not seek to construe any word in these
phrases; rather, [defendant] attempts to limit the terms as much as possible by inserting
additional words") (citing *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir.
1997)).

    Claim Language.  The term "name" appears in all three independent claims of the patent.
The claims as properly construed require that the name be simply a title that describes and
identifies a particular audio file.  (*See* claims 1, 17 and 28).  Dependent claims 8, 9, 10, and 11
each claim a specific example of a name, reflected in Affinity's proposed construction:

- "8. The system of claim 1, wherein the name is a playlist name."

- "9. The system of claim 1, wherein the name is a song title."

- "10. The system of claim 1, wherein the name is an artist name."

- "11. The system of claim 1, wherein the name is a user customized name identifying a
  playlist that comprises the audio file."

---

[6]    While it is accurate to state that a selectable graphic representing a name is capable of
serving as a link to a particular audio file in the claims of the '833 Patent and trigger processing
of the audio file, the claimed "name" itself does not require the creation of a "link" between the
name and an audio file.

[7]    It appears that Defendants will rely on dictionary definitions to support their construction.
(JCCPS, DI 251-2, at 35-36).  Those definitions appear to describe other contexts, and cannot
alter the intrinsic record of the '833 Patent.  *Phillips*, 415 F.3d at 1318 ("[E]xtrinsic evidence by
definition is not part of the patent and does not have the specification's virtue of being created at
the time of patent prosecution for the purpose of explaining the patent's scope and meaning.").
Affinity will respond more fully once Defendants explain the basis for their position.

Moreover, there is no support in the claims for construing the association of the name to the audio file to require the creation of a "link" that can be selected and trigger processing of an audio file.  As described above, it is the soft buttons (which can include representations of a name) that must be linked to the audio files.

Specification.  The term "name" does not appear in the specification of the '833 Patent, but the example of the type of information that can be presented within a graphical user interface is made clear in the discussion of Radio dial 412:

> However, radio dial 412 surpasses the limitations of conventional systems through providing a programmable radio dial of user customized audio information.  Radio dial 412 includes several stations that may be programmed using program interface 413.  The preset stations may include several different types of user customized preset information such as user selected playlists, Internet broadcast stations, top lists, group playlists, artist-selected lists, Internet radio station, conventional radio stations, Internet phone, cellular phone, etc. and other functions, features, or information associated with audio information.

('833 Patent, 11:17-27).

The specification also makes clear that the term "link" refers to a selectable link that may be accessed for communicating or downloading audio files – it is not referred to as part of the descriptive information associated with each audio file:

> In another embodiment, a link or network address broadcasting the selected audio information may be accessed and, at step 204, wirelessly communicated to an electronic device.
>
> ***
>
> In one embodiment, the method of FIG. 2 may be deployed in association with an Internet website operable to display selectable links for downloading information. The information may include audio information such as MP3s, streaming audio, streaming, internet broadcasts, etc. are selectable by a user and operable to be wireles[]sly communicated to an electronic device.

(*Id*. at 6:55-58; 7:25-31).  In short, a link is attached to the selectable graphic (*i.e.*, the soft button).

Prosecution History.  During the prosecution, Affinity explained that "In practice, a graphical interface item (which could be, for example, Radio dial 412 of Fig. 4) includes a name that is associated with a given audio file."  (Exh. L, 3/19/07 Response to Office Action, at 9). The Examiner's response used the term "name" in the same manner:

> [All pending independent claims] disclose a portable electronic device displaying a graphical interface item comprising a name associated with an audio file wherein the portable electronic device is communicatively coupled to a different electronic device and the portable electronic device communicates a representation of the graphical interface item to the different electronic device for display on said different electronic device.

(Exh. M, 5/22/07 Office Action at 2-3).  Affinity then responded using the term the same way:

> The Examiner suggests that the specification does not teach or suggest the existence of a graphical interface item that:  (1) links a name to an audio file; and, (2) is communicated to and used by different devices.  . . .  As mentioned in the specification quotes presented below, radio dial 412 includes user-defined names that are linked to available audio sources such as playlists of stored MP3 files.

(Exh. K, 7/6/07 Response to Office Action, at 8-9).  As made clear by the Applicants, it is the graphical interface item (*i.e.*, the preprogrammed soft button) that "links" the name to the audio file; the name itself does not have that linkage (it is simply "associated" with the audio file).

        **d.**      **"To select an available audio file for processing" (17 & 28)**

| Affinity's Construction | Defendants' Construction | Volkswagen's Construction |
|---|---|---|
| To select an available audio file for converting into an audio signal. | Does not require construction. | Does not require construction. |

Independent claims 17 and 28 use the phrase "to select an audio file for processing" to describe the ability of the separate device to permit a user to chose an audio file the user would like to hear through the audio system.  Because the term "processing" may not be readily understood by the jury, Affinity believes this term should be construed.  *BridgeLux, Inc. v. Cree,*

*Inc.*, 2008 U.S. Dist. LEXIS 43821, *22 (E.D. Tex. June 3, 2008) (Giblin, M.J.) (purpose of claim construction is to "guide the jury in applying the elements of a claimed invention to specific aspects of an accused device") (citing *Embrex, Inc. v. Service Engineering Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000); *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 874-75 (Fed. Cir. 2004)).  Defendants disagree.

> Claim Language.  The preamble for claims 17 and 28 recites that the claimed invention is an audio system, and both claims describe the sending of information from the portable electronic device to the separate electronic device so as to permit a user to interact with the separate device "(1) to navigate through a plurality of audio files; (2) to view at least a partial representation of the menu on the associated display; and (3) to select an available audio file for processing."[8]  The structure of claims 17 and 28 makes clear that a user can interact with the GUI on the separate electronic device to navigate through the audio files saved on the portable electronic device and select an audio file to be converted into an audible signal.  The term "process" connotes that this can be accomplished by converting the digital file into an analog signal that can be outputted through speakers connected to the claimed audio system.

> Specification.  The specification consistently and exclusively describes the claimed functionality of the separate electronic device in terms consistent with Affinity's proposed construction.  The Abstract describes the purpose of the user's selection of an audio file as "The in dash sound system component [of the automobile] may have a selector, which may be, for example, a button, that allows a user to select the first playlist for outputting via the speaker."

---

[8]      In the JCCPS, Affinity stated that the ability of the user to navigate and view representations of the audio files would inherently occur before the audio file is converted into an audio signal and sought a construction on that issue.  (*See* JCCPS, DI 251-2, at 55). Defendants maintained that the order of the steps need not be construed.  *Id.*  In order to minimize the number of disputed issue, Affinity agrees that no construction is necessary regarding the order of navigating, viewing and processing the audio files.

('833 Patent, Abstract).  The specification specifically describes "processing into an audio

signal" as an example of how an audio file is played:

> In one embodiment, electronic device 300 may be operable as an audio player configured
> to play digital representations of music. For example, electronic device 300 may also
> include **an MP3 player operable to process the received information into an audio**
> **signal**. Therefore, electronic device 300 may be used to receive wirelessly communicated
> MP3 audio files and play these files using an MP3 player when desired.

('833 Patent, 8:10-17) (emphasis added).  The specification also explains that the purpose of

selecting an audio file is to permit a user to listen to the audio file:

> During operation, electronic device 907 may be mounted within interface 904. Electronic
> device 907 may also be powered or recharged via power line 910 and communicate with
> the systems audio system via interface cable or bus line 911. Audio information
> communicated to electronic device 907 may be transferred to audio system 901 such that
> **a user may listen to selected audio information**. For example, a user may have
> previously selected a plurality of audio files to be transmitted to electronic device 907.
> Electronic device 907 may communicate the selected audio information to the
> automobiles audio system that utilizes interface 901 thereby allowing the user to listen to
> selected audio information.

(*See* '833 Patent, 17:52-63 (emphasis added); see also *id.* at 11:45-60)).  In sum, Affinity's

construction is consistent with the purpose of the claimed invention, which is to allow a user to

select a particular audio file or files the user would like to hear by using the GUI of an

automobile's display in order to select a particular audio file on the portable electronic device.

*See Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most

naturally aligns with the patent's description of the invention will be, in the end, the correct

construction.").

    <u>Prosecution History</u>.  The prosecution history fully supports Affinity's construction.

Affinity relied on the emphasized portion of above-quoted passage from Column 17 and Figure 9

to overcome a written description rejection.  (*See* Exh. K, 7/6/07 Response to Office Action, at

10).  The Examiner then reiterated that understanding of the invention in response:  "the

specification teaches that the electronic device can communicate with an automobile sound system and information is communicated from the electronic device to the automobile sound system **such that a user may listen to selected audio information**." (Exh. P, 8/14/07 Office Action at 3) (emphasis added). Given the unequivocal support in the intrinsic record, Affinity requests that the Court clarify the meaning of "processing" in the context of claims 17 and 28 to mean *converting the audio file into an audio signal*.

### 2. Terms Related To Physical Structures

#### a. "Mount" (28)

| Affinity's Construction | Defendants' Construction | Volkswagen's Construction |
|---|---|---|
| A communication interface that connects a portable device and a separate electronic device. | A fixture designed to receive and secure the portable electronic device in a stationary position. | Volkswagen joins in Defendants' proposed construction. |

The dispute concerning the claim term "mount" appears to be whether the term should be construed to be a communication interface that connects the two primary physical components of the claimed invention (as proposed by Affinity) or whether it is a fixture that secures the portable electronic device in a stationary position (as proposed by Defendants). Affinity's construction is consistent with the intrinsic record and preserves the broad meaning intended for the physical structure that facilitates communications between the two devices. In contrast, Defendants' construction would introduce ambiguity into the term while at the same time excluding several preferred embodiments disclosed in the specification.

Claim Language. The term "mount" appears in only one independent claim (claim 28), which requires the mount to be located within an automobile having a sound system. (*See* '833 Patent, claim 28). The role of the "mount" in the automobile is apparent from the context in

which the term appears in claim 28:  "a mount communicatively coupled to the electronic device

and configured to engage a physical interface of a portable electronic device." (*Id.*).  Likewise,

dependent claim 35 (which depends from claim 34, which, in turn, depends from claim 28)

provides additional support for Affinity's proposed construction of the claimed "mount,"

specifically reciting that the mount need not be integrated into a console of the automobile and

that the mount can simply be a "cable" that includes an interface for the portable electronic

device on one end and that, is communicatively coupled to the automobile's electronic device on

the other end:

> 34.  The system of claim 28, wherein the associated display and the user interface
> mechanism are integrated into a console of the automobile.
>
> 35.  The system of claim 34, wherein a portion of the mount that is configured to engage
> the physical interface of the portable electronic device is not integrated into the console,
> further comprising a cable at least partially couples the portion of the mount that is
> configured to engage the physical interface of the portable electronic device and another
> portion of the mount that is communicatively coupled to the electronic device.

('833 Patent, claims 34 and 35).

The other claims also support Affinity's construction.  Although the term "mount" does

not appear in any other independent claim, the phrase "mounting location" appears in claim 1

and in dependent claim 27, and references a location on the portable electronic device that

includes an interface for communicatively coupling the two devices.  The concept of a "mount"

in the claims focuses on the structure that permits a communicative connection with the physical

interface of the portable electronic device.  Claim 27 is explicit about this:

> 27.  The system of claim 17, further comprising: a mounting location on the portable
> electronic device that includes a physical interface configured to communicatively couple
> the portable electronic device to the different electronic device; and a mount configured
> to communicatively couple to the different electronic device and to engage the physical
> interface.

('833 Patent, claim 27).

In contrast, Defendants' construction is at odds with the claim language.  Nothing in the claim language requires or even suggests that the portable electronic device must be in a fixed stationary position.  Rather, by specifying that the mount need not be integrated into the console of the vehicle and can simply be a cable, the claim language makes clear that the portable electronic device need not be in a fixed stationary position.

Specification.  The specification explicitly defines the role of the mount in the claimed invention:  "Mount 511 allows the user to couple electronic device 512 to the automobile and provide an interface for communication between electronic device 512 and the automobile audio systems." ('833 Patent, 12:26-29).[9]  This defining attribute of the term "mount" is consistent with the use of term in the claims and Affinity's proposed construction, but is absent from Defendants' proposed construction.

The specification proceeds to describe the flexibility of the various physical embodiments the "mount" can take:  "Mount 511 may be located in many different locations within an automobile such as coupled to a sun visor, center console, dashboard, floorboard, etc."  (*Id.* at 12:23-26).  Defendants' proposed construction cannot be squared with this disclosure from the specification because Defendants' construction would require securing the portable electronic device "in a stationary position," but fails to explain what the term "stationary" is relative to.  If it is relative to the automobile, or relative to the automobile's stereo system, then, for example, a mount affixed to a "sun visor" (as described above) would fail that test since sun visors are well known for their ability to be moved into multiple positions so as to obstruct sunlight.  If Defendants mean to suggest that "stationary" is judged relative to the portable electronic device

---

[9]     The Abstract likewise refers to a "cable interconnecting the electronic device and the in dash sound system. . . ."  ('833 Patent, Abstract).

(*i.e.*, the mount is stationary with respect to the portable electronic device), then Defendants'

proposal becomes circular and meaningless.

The contradiction between the specification and Defendants' proposed construction

becomes even more stark when Figure 9 is examined.  Figure 9 shows an embodiment in which a

portable electronic device is connected to an automobile stereo system.  The specification

describes the mount of Figure 9 as follows:

> FIG. 9 illustrates an automobile console having a mount for an electronic device
> according to one embodiment of the present invention. . . .  Interface 904 may be
> coupled to an audio system 901 via plug 905 and cable 908, which may be coupled to an
> auxiliary line into audio system 901.  Interface 904 may also include contact 906 for
> contacting electronic device 907. . . .  During operation, electronic device 907 may be
> mounted within interface 904.



*FIG. 9*

(*Id.* at 17:38-53).  In short, Interface 904 is the mount of the claimed embodiment, and it is connected to the automobile's audio system only by a cable (depicted and described as "cable 908").  Electronic device 907 (which is a portable electronic device as claimed) connects to the mount

(interface 904), which in turn is attached to a cable (cable 908), but neither the mount nor the

portable electronic device is stationary with respect to the automobile or with respect to anything

else.  In short, Defendants' construction would exclude a preferred embodiment of a "mount,"

and cannot be correct.  As this Court previously noted, "[t]he Federal Circuit has consistently

held that a claim construction that excludes a preferred embodiment is 'rarely, if ever, correct.'"

*Iovate Health Sciences, Inc. v. Bio-Engineered Supplements & Nutrition, Inc.*, 2008 U.S. Dist.

LEXIS 44269, at *12 (E.D. Tex. June 5, 2008) (Clark, J.) (quoting *Vitronics Corp. v.*

*Conceptronic*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).  *See also*, *Sandisk Corp., v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) (same).[10]

        <u>Prosecution History</u>.  As quoted and discussed above, the prosecution history extensively discusses the interconnection and communication between a portable electronic device and a separate electronic device of an automobile, and makes no reference to or requirement of the portable electronic device being affixed or stationary with respect to either the automobile or the automobile's electronic device (or anything else).  Thus, the prosecution history is fully consistent with Affinity's proposed construction.

        **b.**       **"Portable electronic device" (1, 17 & 28)**

| Affinity's Construction | Defendants' Construction | Volkswagen's Construction |
|---|---|---|
| A handheld electronic device that can play digital audio files independent of another electronic device; such handheld devices can include personal digital assistants, MP3 players and cellular telephones. | An electronic device that is transportable, such as, for example, a portable digital assistant (PDA), MP3 player, CD player, cellular phone, or laptop computer. | Volkswagen joins in Defendants' proposed construction. |

        There appear to be three disputes between the parties regarding the meaning of "portable electronic device" in the claims:  (i) whether it must be capable of playing digital audio files independent of another electronic device; (ii) whether a "CD player" should be recited as an

---

[10]     Defendants' construction is also inconsistent with the embodiments of a "mount" shown in Figure 6.  According to the specification, "System 600 further includes mount 605 for mounting electronic device 606 for hardwire communication of information."  ('833 Patent, at 12:60-62)  Thus, 605 is a "mount" in Figure 6, and yet the only thing that is affixed to the "mount" is a cable that runs to a personal computer.  (*See* '833 Patent, Fig. 6).  Like Figure 9, the "mount" in Figure 6 is not stationary with respect to anything, and the electronic device 606 mounted within it is not stationary with respect to anything other than the mount itself (which simply means there is a physical connection affixing the mount and the mounted device).

example of a "portable electronic device" within the meaning of the claims; and (iii) whether a "laptop computer" should be recited as an example of a portable electronic device.

Claim Language.  The claim language provides information about the claimed portable electronic device based on the context in which it is used and the specific requirements recited.

With respect to the first requirement advanced by Affinity – that the electronic device can play digital audio files independent of another electronic device – this is consistent with the claim language, and is specifically required by statements made in the prosecution history. Accordingly, the prosecution history will be the focus of the discussion with respect to the first issue.

With respect to the second issue – whether a "CD player" is an example of a "portable electronic device" – Affinity's objection is two-fold.  First, many devices that a jury would think of as a "CD player" are not intended to be portable in any sense of the word (*e.g.*, a home stereo component).  Second, most CD players that existed as of 2000 could not satisfy the other requirements of the "portable electronic device" recited in the claims.  For example, claims 17 and 28 require that the portable electronic device include "software saved at the portable electronic device and configured to direct the portable electronic device to save an audio file in the memory, to associate the audio file with a name. . . ."  While CD players in 2000 had the ability to buffer small segments of digital media stored on a CD during the process of converting the digital information on the CD to an audio signal, CD players did not have memory for storing entire audio files nor software configured to permit an audio file to be saved to the memory of the CD player and then associated with a name; instead, a user inserted a prerecorded audio CD and pressed play.  Accordingly, the inclusion of a CD player in the list of exemplary portable electronic devices could be highly misleading to the jury.

With respect to the third issue, the concept of a portable electronic device as claimed is a device that can be conveniently transported and used within an automobile, *i.e.*, a handheld device.  Claim 14 specifically distinguishes a portable electronic device from a personal computer:

> 14.  The system of claim 13, further comprising a software application configured to execute on a personal computer, wherein the software application is configured to allow the user to update the graphical interface item of the portable electronic device.

('833 Patent, claim 14).  The portable electronic device can communicate with a personal computer in order to receive and store audio files and updated descriptive information associated with the audio files (which the portable device can then communicate to the separate electronic device), but claim 14 makes clear that the portable electronic device is not itself a personal computer.

Further, it would be highly confusing to a jury if "laptop computer" were installed as an automatic qualifier for "portable electronic device" because claim 18 (which Affinity is asserting) recites that "the portable electronic device is a cellular telephone."  While the three examples proposed by Affinity can converge into a single mobile handheld device – a PDA, cell phone, and MP3 player – the concept of a laptop computer conjures a very different image than the concept of a cellular telephone.  Indeed, the idea of mounting a computer into an automobile is completely at odds with the disclosure of Claim 28 if the "portable electronic device" were construed to be capable of being as large as a laptop computer.

Specification.  The examples in the illustrative list in Affinity's proposed construction are all taken from the specification of the '833 Patent.  ('833 Patent, Abstract, 13:9-23, 18:5-15).  A common feature of all these portable devices disclosed in the specification is the ability to hold the devices in one hand (*i.e.* they are all handheld devices).  This is also apparent from every

figure that depicts a portable electronic device. ('833 Patent, Figs. 5, 6, and 9).  Significantly, neither a CD player nor a laptop computer is ever described in the specification as an example of the claimed embodiment.

With respect to the first disputed issue (*i.e.*, the ability to play digital audio files independent of another electronic device), the specification is fully consistent with Affinity's proposed construction, as it never discloses a device that <u>cannot</u> play digital audio files independent of another electronic device as an example of the claimed embodiment.

With respect to the second issue (*i.e.*, Defendants' proposal to include "CD player" in the list of examples), the specification only refers to a "CD player" as an example of a conventional stereo system that is distinct from and not the claimed invention, for example  "Console 900 includes a conventional audio system 901 comprised of a receiver 902 and CD player 903." ('833 Patent, 17:40-42; *see also id.* at 10:37-41).  The specification never refers to a CD player as an example of the claimed embodiment.

With respect to the third issue (*i.e.*, Defendants' proposal to include "laptop computer" in the list of examples), the term "laptop computer" never appears in the specification.  Instead, the examples of the claimed embodiment refers to several types of handheld devices, not computers that require a flat surface and both hands free to operate as is a typical feature of any laptop computer.  For example, the description of Figure 9 refers to the portable electronic device as a PDA device operable to play audio files:

> Electronic device 907 may include a plurality of different types of devices.  For example, electronic device 907 may include a PDA device operable to store selected audio information. The information may be either remotely downloaded using an Internet web browser and wireless communication to the PDA device.  In another embodiment, selected audio information may communicated to a PDA device via a hard wire coupled to a computer system interfacing with the Internet. In another embodiment, electronic device 907 may include an audio file player operable to play audio files such as MP3s, etc.

32

('833 Patent, 18:5-15).  Likewise, the description of Figure 6 (with the mount shown above) refers to a "portable electronic device" as being distinct from a computer; instead, it is a cellular telephone on which voicemail can be retrieved:

> In one embodiment, a user may receive the voice mail message via a portable electronic device.  For example, a user may be using remote device 605 operable to receive wirelessly communicated information.  System 600 would receive the voice mail message and forward the voice mail message to a user's portable electronic device 606. In this manner, a user may be capable of receiving voice emails at remote locations.

('833 Patent, 13:16-23).  Finally, the Abstract refers only to a "portable MP3 player."  ('833 Patent, Abstract).

Prosecution History.  As described above, the prosecution history provides ample support for the first proposed requirement by Affinity (*i.e.*, that the device must be capable of playing digital audio files independent of another electronic device).  The Examiner rejected the pending claims based in part on the Lau reference.  In distinguishing that reference, Affinity stated that the reference did not disclose a portable electronic device.  (Exh. Q, 11/1/05 Response to Office Action, at 17).  Affinity then stated that "Portable electronic devices are well known in the art of electronics as devices or systems that may allow a user to operate a device, for example, in a mobile environment independent or untethered to another system."  *Id.*  This statement was made to distinguish the claimed "portable electronic device" from prior art is the type of clear, definitional statement that restricts the meaning of "portable electronic device" to mobile (*i.e.* handheld) devices that can be operated independent of another device.  *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008).  ("'[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution.'  . . .  A patentee could do so, for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art.").

33

c.      "Firmware" (29)

| Affinity's Construction | Defendants' Construction | Volkswagen's Construction |
|---|---|---|
| Software that is stored in some fixed form, such as a read-only memory. | System software embedded in the electronic device. | Does not require construction. |

Affinity's proposed construction of "firmware" adds clarity for the jury and is consistent with the term's commonly understood meaning.  In contrast, the circular construction proposed by Defendants (other than Volkswagen) attempts to read in an additional limitation – requiring the firmware to be "system software" – that is not required by the intrinsic record.

Claim Language.  The term "firmware" appears only in dependent claims 25 and 29 of the '833 Patent (Affinity is only asserting claim 29).  The term "firmware" does not appear in the written specification and is not discussed in the prosecution history.  Both dependent claims 25 and 29 explicitly state that firmware is "software embedded" in an electronic device:

25.  The system of claim 17, wherein the software is embedded in the portable electronic device as firmware.

29. The system of claim 28, wherein the electronic device is configured to receive the collection of information and to present the name on the associated display by software embedded in the electronic device as firmware.

Claim 25 requires the firmware to be embedded in the portable electronic device; in claim 29, the firmware is embedded in the separate electronic device that is part of the sound system of the automobile.  While it is accurate to construe firmware as software embedded in an electronic device as Defendants (except Volkswagen) propose, this construction fails to add any clarity to the meaning of the term since the claim language itself makes clear that the software is embedded in the electronic device.  Defendants' contention that the term "firmware" be further limited to "system software" is inconsistent with the functions of the software as specified in the independent claims.  Independent claims 17 and 28 identify multiple functions the software is

34

configured to perform, including function that could be performed by applications running on the operating system of the device, and not "system software" to the extent this vague term can even be understood.

Specification / Prosecution History.  The identification of read-only memory devices as an example of structure that permits software to be stored in a fixed form as provided in Affinity's proposed construction is consistent with the specification which provides:

> Processor 302 may be operable using software that may be stored within storage medium 303. In one embodiment, software upgrades may be communicated to electronic device 300 via wireless communication allowing for efficient system upgrades for electronic device 300. Storage medium 303 may include one or several different types of storage devices. For example, storage medium 303 may include programmable gate arrays, ROM devices, RAM devices, EEPROMs, minidisks or other memory devices operable to store information.

('833 Patent, 7:58-67).  While the above passage suggests the software can include "system upgrades," it does not require the software to be exclusively "system software."

Extrinsic Evidence.  Both Affinity and Defendants identified contemporaneous computer dictionaries as extrinsic evidence of how a person of ordinary skill in the art would understand the term "firmware."  Affinity submits that the *Dictionary of Computer and Internet Terms* is indicative of the commonly understood meaning of firmware, specifically:

> Firmware – software (i.e., computer programs) that is stored in some fixed form, such as a read-only memory (ROM).

(*See* Exh. R, Douglas A. Downing, Michael A. Covington, Melody Mauldin Covington, *Dictionary of Computer and Internet Terms*, p. 179 (7th Ed. Barron's Educational Series, Inc. 2000)).  The extrinsic support cited by the Defendants (except Volkswagen) in the JCCPS also supports Affinity's proposed construction.  *The Authoritative Dictionary of IEEE Standards* provides several definitions for "firmware," including "the combination of software and data that

reside on read-only memory."  (*See* Exh. S, IEEE, *The Authoritative Dictionary of IEEE Standards Terms*, p. 438 (7th Ed. IEEE Press 2000)).

> **B.     Claim Phrases that Need Not Be Construed But Proposed For Construction By Defendants**
>
> > **1.     "Configured to communicate …" Phrases (1, 17 & 28)**

Defendants (other than Volkswagen) contend that several additional phrases in the three independent claims – all of which involve the language "configured to communicate" – should be construed.  Neither Affinity nor Volkswagen believe that these phrases require construction.

Defendants' proposed constructions of the "configured to communicate" claim phrases are all quite similar and share the common feature of attempting to read an additional limitation into the independent claims that finds no support in the intrinsic record and that would not add any clarity to the meaning of these claim phrases.  The Defendants (except Volkswagen) seek to read into the independent claims a requirement that the descriptive information associated with audio files have the same appearance on both devices (although even this standard is not defined) and, therefore, Defendants (except Volkswagen) contend that the software and portable device itself must be configured to send information regarding "**how**" information about an audio file "**should be displayed**."  This concept of requiring the portable device to send information regarding "how" descriptive information associated with an audio file "should be displayed" is part of Defendants' proposed construction regardless of whether the claimed information being communicated from the portable electronic device is recited as a "graphical interface item," "interface information," "collection of information," "graphical menu," or just a "menu," as indicated in claim 28.  Provided below is a chart showing these claim phrases, Defendants proposed construction (emphasis on the common wording), and Affinity and Volkswagen's position that the terms need not be construed:

| Claim Phrase | Defendants' Construction | Affinity and Volkswagen's Position |
|---|---|---|
| Configured to communicate a representation of the graphical interface item to the different electronic device via the physical interface to facilitate a displaying of the representation  (claim 1) | Configured to send a representation of the graphical interface item, and graphical information indicating **how** the graphical interface item **should be displayed**, to the different electronic device via the physical interface. | Does not require construction. |
| configured to communicate interface information to the different electronic device in order to allow a user to view at least a partial representation of a graphical user interface (claim 1) | Configured to send, from the portable electronic device to the different electronic device, interface information indicating **how** a partial representation of the graphical user interface **should be displayed** on the screen of the different electronic device. | Does not require construction. |
| configured … to communicate a collection of information … such that a user can interact with the different electronic device: … to view at least a portion of the graphical menu on the associated display (claim 17) | Send, from the portable electronic device to the different electronic device, graphical information indicating **how** a portion of the graphical menu from the portable electronic device **should be displayed** on the screen of the different electronic device. | Does not require construction. |
| configured to communicate interface information to the different electronic device in order to allow the user to view the graphical menu on the associated display in a graphical user interface (claim 17) | Configured to send, from the portable electronic device to the different electronic device, interface information indicating **how** the graphical menu from the portable electronic device **should be displayed** on the screen of the different electronic device. | Does not require construction. |
| configured to … communicate a collection of information … such that a user can interact with the electronic device: … to view at least a partial representation of the menu on the associated display (claim 28) | Configured to send, from the portable electronic device to the electronic device of the automobile sound system, graphical information indicating **how** a partial representation of the menu from the portable electronic device **should be displayed** on the screen of the display of the automobile sound system. | Does not require construction. |

As explained in Sections III (A) 1(a)-(c) above addressing the disputed terms "graphical user interface," "preprogrammed soft button," and "name," the additional restricting constructions proposed by Defendants (except Volkswagen) are contradicted by the intrinsic record, which consistently describes that a representation of the "name" (*i.e.*, the title of an audio file, such as a song title) as the only descriptive information that needs to be communicated between the two devices.  There is nothing in the intrinsic record that requires the particular graphical representation of the name to be identical on the two electronic devices; all that is required is that each device present a representation of the same name.  Indeed, each independent claim includes language emphasizing that the graphical representation of the audio file need not be identical on the two devices.  (*See* '833 Patent, claim 1 (communicating a "representation of the graphical interface item" and permitting a user to view "at least a partial representation" of a GUI); claim 17 (communicating "a collection of information comprising the name" wherein the name is included in "a graphical menu of available content" and being able to view "at least a portion of the graphical menu"); claim 28 (communicating "a collection of information comprising the name" wherein the name is included in "a menu of available content" and being able to view "at least a partial representation of the menu")).  Notably, claim 28 includes no claim language even suggesting a "graphical" representation of the name is communicated to the separate device.  In short, Defendants (except Volkswagen) are attempting to simply re-write long claim phrases so as to add in new limitations that are not present in the claim language or the intrinsic record.  That is not a proper purpose of the claim construction process.  *Grantley Patent Holdings, Ltd v. Clear Channel Comms., Inc.,* 2008 U.S. Dist. LEXIS 1588, *12 (E.D. Tex. Jan. 8, 2008) (Clark, J.) (rejecting submission of "entire paragraphs of certain claims for

construction when there was really no dispute over the meaning of any particular word or term")

(citing *U.S. Surgical Corp. v. Ethicon, Inc*., 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

### 2.    "Interface information"  (1 & 17)

| Affinity's Construction | Defendants' Construction | Volkswagen's Construction |
|---|---|---|
| Does not require construction. | Visual layout data for a graphical user interface. | Does not require construction. |

Both Affinity and Volkswagen agree that this claim term does not require construction.

The Defendants (except Volkswagen) again attempt to read into claims 1 and 17 a limitation not

present in the claims or required by the intrinsic record and that would require the portable

electronic device to send "visual layout data" to the separate device.  For the same reasons above

explaining why it is improper to read into claims 1 and 17 a requirement that the portable device

send information regarding "how" descriptive information regarding audio files is presented,

Defendants' proposed construction of "interface information" is improper.  In sum, nothing in

the intrinsic record supports Defendants' attempt to narrowly construe the type of information

that can constitute interface information to only be visual layout data.  Rather, the remainder of

the claim language provides a sufficient recitation of the type of interface information that needs

to be exchanged, specifically:

- Claim 1 recites "wherein the portable electronic device is configured to communicate **interface information** to the different electronic device *in order to allow a user to view at least a partial representation of a graphical user interface that includes the graphical interface item on the associated display, wherein the graphical user interface comprises a plurality of preprogrammed soft buttons that are linked to respective audio information sources*"

- Claim 17 recites that "wherein the portable electronic device is configured to communicate **interface information** to the different electronic device *in order to allow the user to view the graphical menu on the associated display in a graphical user interface that includes a plurality of preprogrammed soft buttons that are linked to respective audio information sources*."

As specified in the claim language, "interface information" includes the graphical representation of at least some of the descriptive information associated the audio files and information that facilitates the selection of audio files.  In contrast, Defendants' proposed construction would limit the claimed "interface information" to an ambiguous definition ("visual layout data") that is not supported by the intrinsic record.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

Respectfully submitted, this 27th day of August, 2009.

By:   /s/ Matthew C. Gaudet

Thomas W. Sankey
TX Bar No. 17635670
twsankey@duanemorris.com
**Duane Morris LLP**
3200 Southwest Freeway, Suite 3150
Houston, TX  77027-7534
Tel.:  713.402.3900

L. Norwood Jameson
wjameson@duanemorris.com
Matthew C. Gaudet
(admitted *pro hac vice*)
mcgaudet@duanemorris.com
Stephanie A. Hansen
(admitted *pro hac vice*)
sahansen@duanemorris.com
**Duane Morris LLP**
1180 West Peachtree Street, Suite 700
Atlanta GA  30309-3448
Tel.:  404.253.6900

Brian McQuillen
(admitted *pro hac vice*)
bmcquillen@duanemorris.com
**Duane Morris LLP**
1540 Broadway
New York, NY 10036-4086
Tel.:  212.692.1000

ATTORNEYS FOR PLAINTIFF
AFFINITY LABS OF TEXAS, LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of **PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** via the Court's CM/ECF system per Local Rule CV-5(a)(3) on August 27, 2009.  Any other counsel of record will be served by first class mail.


/s/  Matthew C. Gaudet