**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

---

| | | |
|---|---|---|
| AFFINITY LABS OF TEXAS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 9:08-cv-00164-RC** |
| | ) | |
| BMW NORTH AMERICA, LLC; *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

---

| | | |
|---|---|---|
| AFFINITY LABS OF TEXAS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 9:08-cv-00171-RC** |
| | ) | |
| ALPINE ELECS. OF AMERICA, INC., *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

---

## DEFENDANTS' CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................... iii

I.      INTRODUCTION AND BACKGROUND ................................................1

    A.      The Named Inventors and Plaintiff Affinity Labs .................................1

    B.      The Prosecution of the '833 Patent .....................................................1

    C.      The '833 Patent's Claims Are Not Supported and Not New .................3

    D.      Level of Ordinary Skill in the Art ........................................................3

II.     DEFENDANTS' PROPOSED CLAIM CONSTRUCTIONS ......................4

    A.      Claim Terms Relating to the Transfer of Graphical Information From a
           Portable Electronic Device to A Different Electronic Device ..............4

          1.      "Interface Information" (Claims 1 and 17) ...............................5

          2.      "Configured to Communicate . . . ." (Claims 1, 17, and 28) ...........8

          3.      Graphical User Interface (Claims 1, 17, 28) ...........................11

    B.      Claim Terms Relating to Physical Structures. ....................................11

          1.      "Mount" (Claim 28) .................................................................11

               a.      Claim Language ..............................................12

               b.      The Specification Requires That a Mount be
                         a Fixture that Receives and Secures the
                         Portable Electronic Device in a Stationary
                         Position .........................................................13

               c.      The Prosecution History Confirms that
                         Mount Must be a Fixture that Receives and
                         Secures the Portable Electronic Device .........................17

               d.      Extrinsic Evidence Further Confirms that
                         Mount Must be a Fixture that Receives and
                         Secures the Portable Electronic Device .........................21

          2.      "Portable Electronic Device" (Claims 1, 17, and 28) ............22

    C.      Claim Terms Relating to The Characteristics and Processing of an Audio
            File ...................................................................................................28

          1.      "Preprogrammed Soft Buttons" (Claims 1, 17, and 28) ........28

i

a. "Preprogrammed" means "Created by the user to customize the display." .......................29

b. ". . . that are linked to respective audio information sources." ......................................33

2. "To associate the audio file with a name" (Claims 17 and 28) .............................................................................35

3. "To select an available audio file for processing" (Claims 17 and 28) .............................................................................38

CONCLUSION.....................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Asyst Techs., Inc. v. Emtrak, Inc.,*
  402 F.3d 1188 (Fed. Cir. 2005) ............................................................... 12

*Computer Docking Station Corp. v. Dell, Inc.,*
  519 F.3d 1366 (Fed. Cir. 2008) ............................................................ 8, 22

*Felix v. Am. Honda Motor Co.,*
  562 F.3d 1167 (Fed. Cir. 2009) ............................................................... 12

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ......................................... 4

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................ 4, 13, 19, 34

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996) ............................................................... 13

Defendants Mercedes-Benz USA LLC, Mercedes-Benz U.S. International, Inc., BMW of

North America, LLC, BMW Manufacturing Company LLC, Hyundai Motor America, Hyundai

Motor Manufacturing Alabama, LLC, Kia Motors America, Inc., Nissan North America, Inc.,

JVC Americas Corp., Kenwood USA Corporation, and Volkswagen Group of America, Inc.

("Volkswagen")[1] (collectively, "Defendants") hereby submit this claim construction brief for

U.S. Patent No. 7,324,833 (the "'833 Patent" or "Patent-in-suit").

## I.    INTRODUCTION AND BACKGROUND

### A.    The Named Inventors and Plaintiff Affinity Labs

The named inventors on the '833 Patent are Messrs. Kevin R. Imes and Russell W.

White.  Both men are long-time members of the intellectual property legal community in Austin.

Mr. Imes is a licensed patent agent, and Mr. White is an attorney who, until recently, was a name

partner with the Austin-based intellectual property law firm of Larson Newman Abel Polansky

and White ("Larson Newman").  Mr. White – in addition to being a named co-inventor – also

prosecuted the application that issued as the '833 Patent.  Messrs. Imes and White met in the late

1990s when they both worked in the patent department of Baker Botts LLP – with Mr. Imes later

also joining Mr. White at Lawson Newman.

### B.    The Prosecution of the '833 Patent

Messrs. Imes and White filed their first patent application with the United States Patent

and Trademark Office ("PTO") on March 28, 2000.  That application was directed to wireless

communications, not to audio systems and methods; the first page of the application states that

---

[1] Volkswagen joins this brief for the terms "portable electronic device," "graphical user
interface," "mount" and "to associate the audio file with a name."  For the term "preprogrammed
soft buttons," Volkswagen also joins the Defendants' arguments relating to the
"preprogrammed" aspect of the term and that the phrase ". . . that are linked to respective audio
information sources" need not be construed.

"[t]he present disclosure relates in general to the field of wireless communications."  *See* Ex. B at 1.  Likewise, the "Summary of Invention" filed with the original application stated:  "The disclosed embodiments allow a radio listener to create a personal playlist and to listen to this playlist *in a wireless atmosphere* while enjoying CD quality sound."  (Emphasis added.)  *Id.* at 4.  This application issued as U.S. Patent No. 7,187, 947, which has claims directed to a "wireless device" or "cellular device" and methods of using them.  Ex. C, '947 Patent, cols. 19 – 22.

On September 23, 2004 – three years *after* Apple announced the launch of its iPod media player – Messrs. White and Imes filed a "continuation" application that claimed priority to the March 2000 filing date of the original application.  This is the application that ultimately issued as the '833 Patent.  In this continuation application, Imes and White removed the "Summary of Invention" section from the original application and broadened the introductory "Field of Disclosure" to state that the claimed invention "relates to an audio system and method."

Between September 2004 and February 2007, the applicants struggled to convince the PTO to grant their patent application.  On three separate occasions, the PTO rejected the applicants' patent claims for trying to cover inventions already well-known to the public (i.e., "prior art").  Exs. J, H, and N (office actions rejecting all pending claims).  Each time, the applicants responded to those rejections by narrowing the scope of their claims to try to differentiate them from the prior art.  And each time, they failed.  *See* Exs. L and O.

In February 2007 the PTO issued final rejections rejecting the claims the applicants filed with the continuation application in September 2004.  Ex. H, 2/27/07 Final Rejection.  On March 19, 2007, six years after Apple announced the launch of its iPod media player, the applicants cancelled the then-pending claims and added entirely *new* claims that, after further amendment,

2

would become the claims issued in the '833 patent.  Ex. D., 3/19/07 Reply to Office Action.  The applicants argued that these new claims were directed to an invention where, for example a graphical interface item, could be viewed on both the portable electronic device and (in whole or in part) on a different electronic device.  *Id.* at 9.  Further, that "providing *a* graphical interface of music choices that can be shown on *displays of several different types of electronic devices* allows a user to be familiar with and to comfortably navigate through and select songs from the different types of devices…."  *Id.* (emphasis added).

### C.    The '833 Patent's Claims Are Not Supported and Not New

Plaintiff unabashedly asserts that the original application filed by Messrs. White and Imes described (for the first time, so the story goes) "the integrated 'ecosystem' that consumers now associate with iPods, iTunes, iPhones, and the products and systems that work with them."  Pltf. Br. at 2.  The reality is quite different.  The general "invention" of each of the '833 patent's claims – a portable electronic device having software configured to send graphical information to an attached, second electronic device – is *not* described in the patent's specification.  Indeed, the claims that ultimately issued were initially rejected during the prosecution as unsupported – and were only allowed after an examiner interview, the substance of which was not recorded.  *See* Ex. E.  Moreover, the claims themselves do not describe a new invention.  Indeed, each and every claim of the '833 patent stands rejected by the United States Patent and Trademark Office and are also the subject of both an *ex parte* reexamination proceeding and a pending *inter partes* reexamination request.  *See* Ex. F, 8/5/09 *ex parte* Office Action (rejecting all claims).

### D.    Level of Ordinary Skill in the Art

Defendants submit that Plaintiff's definition of the level of ordinary skill in the art is too vague.  For example, it is not clear what "integration of components for [electronic devices with human interfaces]" entails.  Instead, Defendants propose that a person of ordinary skill in the art

would have at least a 4 year degree in Electrical Engineering (EE), Mechanical Engineering (ME), or Computer Science (CS) or similar technical degree, and 2 years of work or research relating to electronic devices with user interfaces.  *See e.g.*, Ex. G, Resume for Court appointed technical expert, Dr. Frank Shipman.

## II.   DEFENDANTS' PROPOSED CLAIM CONSTRUCTIONS[2]

### A.   Claim Terms Relating to the Transfer of Graphical Information From a Portable Electronic Device to A Different Electronic Device

As noted above, the core of claims in the '833 Patent relates to the transfer of graphical information from a portable electronic device to an attached, different electronic device.  All the independent claims require a portable electronic device that includes a display and software to display graphical user information on the display.

The claims further require that software – which is stored on the portable device – be able to send graphical information to a different device, which is then displayed on the different device, allowing a user to interact with the different electronic device to view the graphical information, and to navigate through and select audio files for processing.  In independent claims 1 and 17, the portable device must also communicate "interface information" to allow a user of the different device to view a particular type of graphical user interface – one that includes a plurality of preprogrammed soft buttons linked to respective audio information sources – on the display of the different electronic device.  In essence, the claimed invention is directed to the

---

[2] The purpose of the claim construction process is to resolve disputes between the parties as to the proper legal construction of terms in the claims of the patent-in-suit.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), the Federal Circuit clarified the proper methodology for construing disputed patent terms, to which the Defendants adhere in this Brief.  For the Court's convenience, the Defendants have also attached, as Exhibit A to this Brief, a chart that lists the claims in dispute, and the parties' proposed constructions. The terms are listed in the Appendix in the order in which they are addressed in this Brief.

*sharing* of a software-based graphical user interface between two different electronic devices. Plaintiff concedes as much in its opening brief.  Pltf. Br. at 7 ("The descriptive information about the audio file is <u>shared</u> by both the portable electronic device and the separate electronic device, and is linked to the same source.") (Emphasis in original).

Because the claimed invention depends entirely on the ability to share a graphical user interface between two electronic devices, the claim terms relating to that sharing of graphical information between those devices must be readily understood by the jury.  Yet Plaintiff, curiously, suggests that the claim terms relating to that key feature of the claimed invention – "interface information" and the "configured to communicate" terms – need not be construed. For the reasons that follow, Defendants' proposed constructions should be adopted.[3]

### 1.    "Interface Information" (Claims 1 and 17)

| Defendants' Construction | Affinity's Construction |
|---|---|
| Visual layout data for a graphical user interface. | Does not require construction. |

Despite arguing that "interface information" does not require construction, Plaintiff nonetheless states that the phrase includes "the graphical representation of at least some of the descriptive information associated [sic] the audio files and information that facilitates the selection of audio files."  Pltf. Br. at 40.  If "interface information" truly did not need to be construed, it would have been unnecessary for Affinity to explain what it believes the phrase means.  The fact that Affinity tried to explain the phrase confirms that "interface information" is hardly an everyday phrase that will be readily understood by the jury without a clarifying

---

[3] Volkswagen does not join in these constructions proposed by the other Defendants.

construction.  Defendants' proposed construction – "visual layout data for a graphical user interface" – is consistent with the language of the claims and the prosecution history.

Claim Language:  First and foremost, the very language of claims 1 and 17 makes clear that "interface information" is visual layout data for a graphical user interface ("GUI").  Claims 1 and 17 each claims "an audio system" that comprises *only* a portable electronic device and software saved at that device.  The portable device is configured to communicate "interface information" to a different electronic device such that a user may view a graphical user interface on that device, but the different electronic device itself is *not* part of the system of claims 1 and 17.  This is confirmed by claims 19 and 20, dependent claims which "further compris[e]" the different electronic device.  Accordingly, the "interface information" communicated by the portable electronic device must *by itself* allow a user to view a "graphical user interface" including a "plurality of preprogrammed soft buttons" on the different electronic device.  In other words, the graphical user interface displayed by the different electronic device is not created by the different electronic device.

The claim language provides further support for Defendants' construction.  For example, claim 17 recites "a graphical menu" that is shown on the portable electronic device.  Claim 17 further recites that after the portable electronic device communicates "interface information" to the different device, that *same* "graphical menu" can be viewed on a display of the different device "in a graphical user interface."  In order for the same "graphical menu" to be viewed on two different displays (*i.e.*, shared), the portable device must communicate "visual layout data for a graphical user interface."

Similarly, claim 1 recites a "graphical interface item" that is displayed on a portable electronic device.  According to claim 1, after the portable device sends "interface information"

6

to the different electronic device, that *same* "graphical interface item" from the portable device is included in "at least a partial representation of a graphical user interface on the associated display."  In order for that same "graphical interface item" to be shared by two different displays, the portable device must communicate "visual layout data for a graphical user interface."

Prosecution History:  The prosecution history also supports Defendants' proposed construction of "interface information."  During prosecution, the Patent Office rejected the applicants' then-pending claims in view of U.S. Patent No. 6,232,539 to Looney, observing that the laptop in Looney – just like the applicants' claimed invention – allowed a user to navigate through files, to view names of audio files, and to select audio files for processing.  *See* Ex. H, 2/27/07 Office Action, at 2 – 4; *see also* Ex. X (Looney).  To overcome Looney, the applicants specifically noted that their claimed invention required that the portable device share its graphical user screen with the second device:  "There is no suggestion that the graphical user screens of Looney or any portion of those screens are to be shared by two different kinds of devices."  *See* Ex. D, 3/19/07 Response to Office Action, at 9 – 10.

Elsewhere in the prosecution history, the applicants make clear that one of the benefits of the claimed invention is that it "allows a user to interact with a somewhat familiar and consistent interface – no matter what device the user is then using to access available content."  Ex. I, 7/6/07 Response to Office Action, at 9.  The import of this statement is clear:  The portable device transfers – to the different device – graphical information that allows the user to interact with its "familiar and consistent interface."  In short – and contrary to Affinity's argument – the prosecution history squarely requires that the portable device transfers visual layout data for a graphical user interface to allow sharing of interfaces between the portable device and the different device.

"[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Philips*, 415 F.3d at 1317 (internal citations omitted).  Here, the applicant described the scope of the claimed invention as one where at least part of "a [single] graphical interface" was displayed on multiple devices. Ex. D, 3/19/07 Response to Office Action, at 9.  Even if the claim language could be interpreted more broadly than Defendants propose, the applicants disavowed such interpretations by arguing that the claimed invention was patentable over the prior art Looney reference because Looney did not teach the "sharing" of all or part of screens between two devices.  *Id.* at 10; *see also Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("A patentee could [limit the meaning of a claim term], for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art." (internal citations omitted)).

In sum, Defendants' proposed construction for the phrase "interface information" is meant to clarify that what is transferred is data that facilitates this sharing of interfaces.  In fact, Defendants' construction accords with Plaintiff's view of the claim term.  Pltf. Br. at 7 ("The descriptive information about the audio file is <u>shared</u> by both the portable electronic device and the separate electronic device, and is linked to the same source.") (Emphasis in original).

### 2.        "Configured to Communicate . . . ." (Claims 1, 17, and 28)

| Defendants' Constructions | Affinity's Construction |
|---|---|
| See Plaintiff's Brief at 37 for a recitation of Defendants' constructions. | Does not require construction. |

Plaintiff also objects to Defendants' construction of the phrases that are directed to the configuration of software residing on the portable electronic device.  Those phrases, which

appear in all the independent claims, specify that the portable device shall send graphical

information to the different device indicating how all or part of the graphical menu from the

portable device should be displayed on the screen of the second device.  Claims 1, 17, and 28.

Again, Defendants' constructions comport with the claim language and the prosecution history.

     <u>Claim Language:</u>  According to Plaintiff, a representation of a name is "the only

descriptive information that needs to be communicated between the two devices."  Pltf. Br. at 38.

That is plainly incorrect.  Plaintiff's construction would essentially rewrite the claims, as shown

below using the second paragraph of claim 17 as an example:

> [S]oftware saved at the portable electronic device and configured to direct the
> portable electronic device to save an audio file in the memory, to associate the
> audio file with a name, to include the name in a graphical menu of available
> content, to present the name on the display of the portable electronic device, and
> to communicate ~~a collection of information comprising~~ the name to a different
> electronic device that has an associated display ~~such that a user can interact with
> the different electronic device: (1) to navigate through a plurality of audio files;
> (2) to view at least a portion of the graphical menu on the associated display,
> wherein the portion comprises the name; and (3) to select an available audio file
> for processing.~~

If claim 17 did not include the crossed out portion above, then Plaintiff might be correct.

Instead, the claim requires that the portable device send sufficient graphical information to the

other device such that the user can (1) view the graphical menu on the different device, (2) use

the screen of the different device to navigate through audio files, and (3) select an audio file to be

processed.  The mere transmission of a name, without more, will not allow the user to view,

navigate, and select audio files using the GUI on the different device.

     Instead, as with the term "interface information," the "configured to communicate…"

phrases require that the software saved on the portable electronic device communicate

information that, by itself, allows a user to *view* something on the different electronic device.  In

addition, the claims make clear that what is viewed is at least a portion of the menu also

displayed on the portable electronic device.  *See* claim 17 ("…to view at least a portion of *the* graphical menu on the associated display…"); claim 1 ("…to view at least a partial representation of a graphical user interface that include *the* graphical interface item on the associated display…"); claim 28 ("…to view at least a partial representation of *the* menu on the associated display…").  This interpretation is confirmed by the applicants' description of the claimed invention during prosecution.

Prosecution History:  As described above in connection with "interface information," the applicants' arguments over Looney in the prosecution history – *i.e.*, clarifying that the portable device shares its graphical user screen with the second device – support Defendants' proposed constructions.  This sharing of screens, enabling the user to be "familiar with and to comfortably navigate through and select songs" is only possible if the portable device is configured to send information indicating how the information from the portable device should be displayed on the screen of the second device.  Ex. D, 3/19/07 Reply to Office Action at 9.

Importantly, "interface information" was not included in all claims when the applicant first rewrote the claims to require the transfer of graphical information in March 2007.  Ex. D, 3/19/07 Response to Office Action, at 3 - 8.  Claim 36 in the application (which eventually became claim 1 of the '833 patent) is a good example.  As originally drafted in March 2007, the only information that the portable electronic device of claim 36 was configured to send to the different electronic device was "a representation of the graphical interface item … to facilitate a displaying of the representation on the associated display."  *Id.* at 3.  Yet the applicants' statements discussed above about how the displays were shared between two devices were made about these claims.  *Id.* at 9-10.  Therefore, while the term "interface information" must be construed as "visual layout data for a graphical user interface" as discussed above, the

"configured to communicate…" terms must also be construed to require the transfer of data indicating how a graphical item should be displayed.

### 3. Graphical User Interface (Claims 1, 17, 28)

In the interest of reducing the number of issues before the Court, Defendants are willing to agree to Plaintiff's proposed construction for the term "graphical user interface."[4]  However, Defendants disagree with Plaintiff's characterization of Defendants' position on this term, as well as Plaintiff's characterization of the claims, specification, and prosecution history. Specifically, Defendants disagree with Plaintiff's assertion that "graphical representation of descriptive information relating to audio files" does not have to "look exactly the same on both devices" and that "the GUI does not have to take any particular form or format."  Pltf. Br. at 11, 12.  Defendants only believe that such a characterization/dispute is not appropriate for this term as it is addressed in "interface information" and the "configured to communicate" terms that are discussed above.  As is explained in detail above, the intrinsic evidence requires that the portable electronic device send interface information, *i.e.*, visual layout data for a graphical user interface, indicating *how* information should be displayed on the screen of the different electronic device. Thus, while agreeing to Plaintiff's proposed construction for GUI, Defendants reserve their arguments as to the construction of these other terms and expressly disagree with Plaintiff's characterization of the relevant evidence.

### B. Claim Terms Relating to Physical Structures.

### 1. "Mount" (Claim 28)

---

[4] Defendants are also willing to agree to Plaintiff's proposed construction for "firmware."  Pltf. Br. at 34 – 36.

| Claim Language | Defendants' Construction | Affinity's Construction |
|---|---|---|
| "a **mount** communicatively coupled to the electronic device and configured to engage a physical interface of a portable electronic device . . ." | "*a fixture designed to receive and secure the portable electronic device in a stationary position*" | "*a communication interface that connects a portable device and a separate electronic device*" |

As framed by Plaintiff, the dispute is simply whether a "mount" must be something more than just a communication interface.  Pltf. Br. at 25-27.   Defendants' construction uses the key words from the specification and prosecution history, which consistently describe a "mount" as a physical fixture designed to receive and secure a portable electronic device.

Plaintiff, in contrast, argues that *any* physical communication interface, including just a cable, can be a "mount."  *Id.*  However, the ordinary meaning of "mount" requires something more than a communication interface; rather, it requires that something that securely attaches or affixes the portable electronic device.  *See, e.g., Asyst Techs., Inc. v. Emtrak, Inc.,* 402 F.3d 1188, 1193 (Fed. Cir. 2005) (finding that the ordinary meaning of "mounted on" is "securely attached, affixed, or fastened to."); *Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 1178 (Fed. Cir. 2009) (construing "mounted" in accordance with its ordinary meaning, i.e., "securely affixed or fastened to").  Indeed, the '833 Patent and the intrinsic evidence describe "mount" consistent with its ordinary meaning and clearly differentiate between a "mount" and a "contact" or a "cable."  Thus, although a mount may include a communication interface, it is first a fixture designed to receive and secure an electronic device in a stationary position.

### a.     Claim Language

Plaintiff's construction of mount as nothing more than a communication interface is redundant of the plain language that is already in the claims.  For example, claim 28 already provides that the mount be "***communicatively coupled*** to the electronic device" and "configured

to *engage the physical interface* of a portable electronic device." '833 Patent, 20:47 – 62 (claim 28).  Plaintiff's proposed construction is redundant of this same language and provides no clarity as to what "mount" is.  Plaintiff's construction suffers from the same defect in the context of claim 27.  '833 Patent, 20:39 – 42 (claim 27).

Furthermore, in arguing that a cable can constitute a mount, Plaintiff ignores that, in claim 35, the mount "further compris[es] a cable."  *See* '833 Patent at 22:8 – 15 (claim 35).  As such, a "mount" cannot "simply be a cable" as proposed by the Plaintiff, as then this portion of claim 35 would have no meaning and read "the [cable]…. further comprising a cable."[5] Therefore, as the claims differentiate between "mount" and a "physical interface" or a "cable," a "mount" must be more than just a connector between the two devices.

**b.     The Specification Requires That a Mount be a Fixture that Receives and Secures the Portable Electronic Device in a Stationary Position**

It is well-settled that "[c]laims must be read in view of the specification, of which they are a part."  *Markman*, 52 F.3d at 979.  Indeed, the specification "is always highly relevant to the claim construction analysis" and "[u]sually, it is dispositive; it is *the single best guide* to the meaning of a disputed term."  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)) (emphasis added).

In this case, the specification clearly and consistently describes a "mount" as a "housing component" intended to "receive" the portable electronic device.  *See*, *e.g.*, '833 Patent at Abstract; 11:61 – 66; Fig. 5A; 12:20 – 65; Fig 5B.  For example, Figures 5A and 5B both depict

---

[5] *Phillips*, 415 F.3d at 1314-15 (noting that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim" and that "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms").

mounts (501 in Fig. 5A and 511 in Fig. 5B) that receive and secure the portable electronic device

in a stationary position:



As the drawings show, the portable electronic device is placed within the mount and then

held there in a fixed, stationary position.  Contrary to Plaintiff's proposed construction, the

mounts depicted in Figures 5A and 5B do more than just interface with the electronic device –

they actually hold and secure the device in a set position.  The associated descriptions of Figures

5A and 5B confirm this understanding of "mount:" "Portable radio 500 includes a ***mount*** 501

operable to ***receive*** electronic device 502."  '833 Patent at 11:63 – 64 (emphasis added).

"Console 510 includes a ***mount*** 511 operable to ***receive*** electronic device 512."  *Id.* 12:22 – 23

(emphasis added).  Thus the portable device is placed "***within*** the mount," although the mount

may be located in various locations within the vehicle.  *Id.* at 11:61 – 66; 12:20 – 65.

14

Figure 9 also discloses that a mount must be more than just a communication interface. Figure 9 depicts "an automobile console having a mount for an electronic device:"



FIG. 9

'833 Patent at 17:38 – 40.  In this embodiment, "electronic device 907 may be mounted *within* interface 904" and, as is shown in the drawing, is held in stationary and fixed position within the mount.  *Id.* at 17:38 – 40, 52 - 53 (emphasis added).  Thus, contrary to Plaintiff's argument that "Defendants' construction would exclude a preferred embodiment of a 'mount,'" *see* Pltf. Br. at 28, Figure 9 actually confirms that Plaintiff's construction is inconsistent with the patent specification.  Indeed, the description of Figure 9 provides that

> Interface 904 may be coupled to audio system via plug 905 ***and cable 908,*** which may be coupled to an auxiliary line into audio system 901.  Interface 904 ***may also include contact 906*** for contacting electronic device 907.

'833 Patent at 17:42 – 45 (emphasis added).  Thus, just as with Claim 35, one of the preferred embodiments of the '833 Patent clearly shows that a mount must be more than just a cable or a contact, *i.e.*, a communication interface, and that the mount must receive and hold the portable electronic device in a fixed, stationary position.

Figure 3 provides further support for Defendants' proposed construction.  Figure 3 discloses that "electronic device 302 may be *mounted* to a portion of a car's console, thereby providing a *removably* coupled electronic device."  '833 Patent, at 9:28 – 31 (emphasis added).  Similarly, Figure 6 – which Plaintiff also claims is excluded under Defendants' construction – shows a system that includes "mount 605 for mounting electronic device 606 for hardwire communication of information:"  *See* '833 Patent at 12:60 – 62.  Considering Figure 6 and the accompanying specification language in view of Figure 9 makes it clear that the mount itself is not merely a communication interface; instead, the mount is a fixture that receives and holds the electronic device that *may also* provide a communication interface.

In contrast, Plaintiff's proposed construction entirely ignores the specification language requiring that the portable electronic device be placed *within* the mount, *i.e.*, that the mount *receive* the device, and the embodiment drawings, which clearly show the device being placed within the mount in a fixed, stationary position.  Plaintiff's proposed construction, wherein a cable is equivalent to a mount, is directly inconsistent with this evidence because a portable electronic device clearly cannot be placed *within* a cable.

In fact, Plaintiff does not (and cannot) argue that Defendants' construction of a mount as a *fixture* that *receives* and *secures* a portable device is inconsistent with the specification.  Plaintiff only claims that the "mount," as disclosed in the specification, need not be stationary "with respect to the automobile or with respect to anything else" because it "may be located in many different locations within an automobile."  Pltf. Br. at 27 – 28.  This argument again ignores and mischaracterizes the plain language of the specification.

In stating that the "mount" "may be *located* in many different locations within an automobile such as *coupled to* a sun visor, center console, dashboard, floorboard, etc.," the

specification makes it clear that the "mount" must nonetheless (1) be "located" at a specific location within the automobile; and (2) be "coupled to" the selected location.  Pltf. Br. at 27; '833 Patent at 12:23-26.  Thus, contrary to Plaintiff's argument, the mount is not free moving. Instead, in light of the specification, "mount" should be construed as being stationary and affixed to a selected location within the automobile.  The fact that the specification identifies multiple options for the "location" of the "mount" is not contrary as each of the identified "locations" (and in turn the portable device secured within the mount) *are not free moving* with respect to the automobile.  Plaintiff's argument that the "mount" (interface 904) in Figure 9 evidences that the "mount" is not stationary "with respect to anything," Pltf. Br. at 28, ignores the description of "mount" above.  Specifically, Plaintiff takes Figure 9 out of context of the prior description of "mount" and ignores that the "mount" must be coupled to a specific location. Defendant's construction is consistent not only with the drawings and the specification, but also with the stated purpose of the system disclosed in the '833 Patent, which is to "maintain[] safe driving fundamentals."  Pltf. Br. at 4.  Thus, Defendants' construction is fully consistent with the specification and encompasses all disclosed embodiments.

### c.      The Prosecution History Confirms that Mount Must be a Fixture that Receives and Secures the Portable Electronic Device

Not surprisingly, Plaintiff's brief omits any meaningful discussion of the prosecution history evidence relevant to the construction of mount.  Indeed, the prosecution history and the art cited during prosecution are consistent with Defendants' proposed construction and confirm that a mount must be more than a mere communication interface (or a cable).

The "mount" requirement first appeared in what was originally claim 30 of the 10/947,755 Application:

An audio system, comprising:

>a vehicle sound system that comprises a speaker and an in dash component that includes an auxiliary connection port;
>
>*an electronic device mount* formed to releasably engage a portion of a portable audio file player that includes a rechargeable power supply and a processor operable to play a locally stored audio file;
>
>*an interface cable interconnecting the auxiliary connection port and the electronic device mount*, the interface cable having at least one conductive element operable to deliver power to recharge the rechargeable power supply, the cable further operable to communicatively couple the portable audio file player to the in dash component.

As the original claim language demonstrates, the Applicants considered an "electronic device mount" to be different than an "interface cable" or "connection port."  The distinction between a "mount" and an "interface cable" or "communication interface" is further confirmed by the Examiner's interpretation of the "electronic device mount" requirement.  In a Non-Final Office Action, the Examiner rejected original claim 30 in view of U.S. Patent No. 6,772,212 to Lau *et al*. (issued Aug. 3, 2004).  In doing so, the Examiner concluded that the "housing" component depicted in Figures 1 and 5 of Lau was equivalent to the "electronic device mount" claimed in the 10/947,755 Application.  Ex. J, 8/25/05 Office Action, at 11 – 13.  Notably, the housing fixture disclosed in Lau Figure 5 is similar to the mount shown in Figures 5A and 5B of the '833 Patent:



Fig. 5

Both drawings show that the electronic device must be received and secured within the mount in a stationary position.  Indeed, the specification in Lau describes Figure 5 as a music server with

"an opening for ***inserting*** disk cartridges" that is "***protected*** by hinged door" and may "include metal springs or high density shock absorbing air pouches inside the outer box in order to suspend the frame that holds the disk cartridge 120."  Ex. K, Lau *et al.*, 6:57 – 65.[6]  Similarly, Lau Figure 1 discloses a "docking station" that can connect via a parallel port, serial port, fire wire connection, or other interface – indicating that the docking station relied on by the Examiner as a mount is more than just an interface – wherein one embodiment is a music server that may be "mounted ***in*** the dash board" of the automobile.  *Id.* 4:42 – 46, 5:9 – 12 (emphasis added)).

The applicants responded by amending claim 30 to clarify that the electronic device must be "portable" and "operable to be used independent of the vehicle sound system," but did not dispute or take issue with the Examiner's characterization of the Lau "housing" component as equivalent to an electronic device mount.  Ex. L, 11/1/05 Reply to Office Action, at 15, 22; Ex. M, 3/21/06 Reply to Notice of Non-Compliant Amendment at 15, 23.  Indeed, the applicants acknowledged that "Lau provides a server 102A mounted as an in dash head unit for an automobile" and that this server was ***removable*** from within the mount.  Ex. L at 17, 22; Ex. M at 18, 23.

On June 26, 2006, the PTO again rejected claim 30, this time in view of U.S. Patent No. 6,232,539 to Looney.  Consistent with the prior discussion of Lau, the Examiner found that Looney disclosed a "***housing component*** at least partially defining a cavity in which the memory and the audio file player are ***secured.***" Ex. N, 6/26/06 Office Action, at 2 (emphasis added).

---

[6] As the Federal Circuit has noted, cited art is intrinsic evidence for purposes of claim construction.  *Phillips*, 415 F.3d at 1317.

Again, the Applicants did not dispute this characterization of a mount in arguing for the

patentability of claim 30.  Instead, they argued only that Looney did not disclose "an interface

cable interconnecting the auxiliary connection port and the portable electronic device ***mount***" –

again confirming that a mount is not merely a cable or a connection port.  Ex. O, 11/27/06 Reply

to Office Action, at 17 (emphasis added)).  The Examiner rejected this argument and issued a

Final Action rejecting claim 30 in view of Looney on February 27, 2007.  Ex. H, 2/27/07 Office

Action, at 2.

The applicants subsequently canceled all original claims and submitted new claims 36-

70, with independent claim 63 specifically reciting "a mount."  After multiple rejections and

amendments not relevant to this claim term, claims 36-70 eventually issued as the claims of the

'833 Patent.  Ex. D, 3/19/07 Response to Office Action, at 6 – 7; Ex. I, 7/6/07 Reply to Office

Action, at 6.  It is clear from the prosecution of the '833 Patent that the applicants (and the

examiner) understood "mount" to be a housing component that receives another device, and not

simply a communication interface, which supports the Defendants' proposed construction.

Plaintiff's argument that a "mount" should be construed as simply a "connection

interface" is similar to the argument made by the patent holder in *Asyst Technologies, Inc. v.

Emtrak, Inc.*, which was rejected by the Federal Circuit.  The claims at issue recited various

computer components to be "mounted."  The patent holder argued that the term should be

construed to mean a "direct electrical connection," such as by a serial cable.  *Asyst*, 402 F.3d at

1193.  The Court rejected that argument because the intrinsic evidence showed that the phrase

"mounted on" should be given its ordinary meaning, i.e., "securely attached, affixed, or fastened

to."  For example, the specification used the term "to refer to a number of other components, and

the context makes clear that the phrase is used in those instances to mean securely affixed to objects."  *Id.* at 1193-94.

> **d.**  **Extrinsic Evidence Further Confirms that Mount Must be a Fixture that Receives and Secures the Portable Electronic Device**

Defendants' proposed construction of "mount" is further supported by extrinsic evidence that describe a "mount" used in the context of a vehicle.  For example, U.S. Patent No. 5,408,382 to Schultz et al., which issued on April 18, 1995, describes a "vehicle mount" for use in a truck for receiving a portable dock which, in turn, receives a pen-based terminal device:  "Once positioned as desired, the locking wheel (162) is tightened to secure the docking system (130) in position.  ***The vehicle mount (150) selectively receives the portable dock*** (140) which in turn selectively receives the pen-based terminal (110)."  Ex. P, 7:31 – 47 (emphasis added).  Figure 23 depicts vehicle mount 150 as keeping the portable dock 140 in a stationary or fixed position, and the locking wheel 162 is tightened to secure the docking system in position.



Similarly, U.S. Patent No. 4,345,147 to Aaron et al., issued on August 17, 1982, describes mounting a mobile business data system in a vehicle, including mounting a portable device:

> The portable data device 10 is preferably contained in a substantially flat rectilinear case which slides into a long narrow slot in the upper portion of the rack 22…. The printer 28 is preferably mounted also upon a vertical side wall of the vehicle just above the driver's side window 52, as shown in FIG. 2…. The printer is mounted to the wall of the vehicle and protected by the printer housing

30 which includes means for direct fastening to horizontal frame members 58 and
60 within the truck body.

Ex. Q, 4:22 – 43.  The Aaron patent provides further evidence that a "mount" must "secure" a

device:  "In order to provide a solid mounting for the housing 30 and the printer 28, the vertical

rails 76 and 78 are adjustable downwardly and secured through the wall of the vehicle to the

frame member 60 by means of bolts or cap screws 80 and 82."  *Id.* 5:29 – 52; *see also* Fig. 2;

Fig. 10.  Therefore, extrinsic evidence further confirms that a "mount" must be a fixture that

receives and secures the portable electronic device, as Defendants have proposed.

### 2. "Portable Electronic Device" (Claims 1, 17, and 28)

| Defendants' Construction | Affinity's Construction |
| --- | --- |
| An electronic device that is transportable, such as, for example, a portable digital assistant (PDA), MP3 player, CD player, cellular phone, or laptop computer. | A handheld electronic device that can play digital audio files independent of another electronic device; such handheld devices can include personal digital assistants, MP3 players and cellular telephones. |

Plaintiff proposes that the term "portable electronic device" should be construed as a

"handheld" electronic device such as a PDA, MP3 player or cellular telephone.  Defendants

propose that "portable electronic device" should be construed as an electronic device that is

transportable, such as a PDA, MP3 player, CD player, cellular phone or laptop computer.

There are two disputes as to the meaning of this term:  (1) whether "portable" should be

limited to "handheld" as argued by Plaintiff (which would exclude laptop computers), and (2)

whether CD players, which may be handheld, should nonetheless be excluded from the definition

of "portable electronic devices," as argued by Plaintiff.  The construction proposed by

Defendants is in accord with the ordinary meaning of the term "portable" in view of the intrinsic

evidence.  *See Computer Docking*, 519 F.3d at 1375 (construing the word "portable" in the term

"portable computer" to mean "capable of being moved about" in light of "the plain meaning of

'portable' and its use in the specification and prosecution history.").  Plaintiff's construction adds unwarranted limitations to the claim.

The Claim Language:  First, the Defendants' proposed construction is consistent with the claim term as recited.  For example, asserted claim 28 recites both "an electronic device" and a "portable electronic device."  Nothing in the claims requires that the portable electronic device be "handheld," or excludes any particular types of portable electronic devices.

Plaintiff points to dependent claims 14 and 18 as support for its position that a laptop computer should be excluded because, according to Plaintiff, the portable electronic devices in those claims cannot be a laptop computer.  Pltf. Br. at 31.  Initially, nothing in claim 14 suggests that the portable electronic device cannot itself be a laptop computer.  But in any event, Plaintiff's argument turns claim construction on its head.  Claims 14 and 18 are *dependent* claims, whereas the term "portable electronic device" appears in the *independent* claims.  It is black letter law that dependent claims are *narrower* than independent claims, not the other way around.  So just because claim 18 specifies that the portable electronic device is a cellular telephone does not mean that the portable electronic device of the independent claims must have cellular telephone capability.  In fact, the doctrine of claim differentiation creates a presumption to the contrary – the "portable electronic device" is presumptively broader than a cellular telephone.  And Plaintiff's construction itself includes as examples PDAs and MP3 players, which may not include cellular telephone capability.

Plaintiff also argues that CD players should not be included as an example of a portable electronic device because some CD players are not portable.  Pltf. Br. at 30.  However, as shown by the intrinsic and extrinsic evidence cited below, some CD players at the time were portable.  Furthermore, this is also true of MP3 players, included as an example in Plaintiff's proposed

construction – some were portable and some were not at the time the application was filed.

The Specification:  The '833 Patent specification provides further support for the

Defendants' proposed construction, and directly contradicts Plaintiff's construction.  Plaintiff's

argument that "portable electronic device" should be construed as "handheld" is not supported

by the specification.  In fact, the patent's depiction of "portable radio system" (item 500) in

Figure 5A shows that being "portable" has nothing to do with size; whereas the radio player in

Figure 5A is transportable, it is not small enough to be "handheld."



The description of Fig. 5A consistently refers to the boombox-like device 500 as a "***portable***

radio" that has a mount 501 for another electronic device 502.  '833 Patent, 11:61 – 12:19.

The specification also contradicts Plaintiff's other argument that "CD player" and "laptop

computer" should not be included in the construction of "portable electronic device."  The

specification describes a portable electronic device as including "an audio file player" (*e.g.,* 18:5-

15) and "portable computing devices" (*e.g., id.* 11:30-44).

The specification describes using various electronic devices in the context of portability,

not in the context of the size of the device.  The term "portable electronic device" is specifically

disclosed in the specification in connection with Figure 6, depicted as item 606.



*FIG. 6*

Although "portable electronic device 606" is not discussed in any detail in the specification,[7] Figure 6 shows that the device is transportable.  The specification also refers to portable electronic device 606 interchangeably as "electronic device 606" and "device 606." '833 Patent, 12:60-65.  The specification repeatedly describes using various electronic devices in the context of portability.  For example, the specification discloses an electronic device for playing songs from a playlist while a person is driving in a vehicle.  *See id.* at 11:53-60.  The specification states that such electronic devices "may include a PDA device operable to store selected audio information…. In another embodiment, electronic device 907 may include an audio file player operable to play audio files such as MP3s, etc."  *Id.* at 18:5-15.   The '833 Patent specification further states that electronic devices "may include a network radio, a modular device, an audio system, a personal digital assistant (PDA), a cellular phone, or other electronic devices operable to receive information wirelessly communicated by communication engine 102."  *Id.* at 4:26-31.  Furthermore, the patent lists "computer systems, portable computing devices, cellular phones, etc." as types of electronic devices.  *Id.* at 11:30-44.  The important point is that nowhere in the specification is a "portable electronic device" described as something that must be handheld.  Thus, the Defendants' proposed construction of the term

---

[7]   For example, the specification only states that "a user may receive the voice mail message via a portable electronic device."  '833 Patent, 13:16-18.

"portable electronic device" is consistent with how the '833 patent specification describes that type of device.

Prosecution History:   The prosecution history of the '833 patent further supports the Defendants' proposed construction.  In order to distinguish their claimed invention over the prior art, the applicants argued to the examiner that the cited prior art did not disclose a "portable electronic device" as claimed.  For example, the applicants argued:

> claim 1 as amended, includes, in addition to other limitations, a 'portable electronic device operable to be used independent of the audio system.' The servers of Lau are not portable but are at best removable or transferable….
>
> Portable electronic devices are well known in the art of electronics as devices or systems that may allow a user to operate a device, for example, in a mobile environment independent or untethered to another system.

See Ex. L, 11/1/05 Reply to Office Action, at 17.  The applicants reiterated this same argument in response to similar rejections in subsequent Office Actions.  See Ex. R, 2/24/06 Amendment, at 18; Ex. O, 11/27/06 Amendment, at 18 ("Sorscher, however, does not disclose the 'portable electronic device' of claim 12.  As set out in claim 12, the portable electronic device is operable to be used 'independent of the audio system.'  Thus, the portable electronic device of claim 12 can be used away from the car and any Sorscher-like receiving apparatus, such as the apparatus 21 of Sorscher.").  That the portable electronic device may be used "independent of" or "untethered" to another system supports the Defendants' construction that the electronic device must be transportable.  Moreover, the exemplary devices in the Defendants' construction are all operable independent of some other system.  So, too, the Examiner considered the laptop featured in Looney to be a "portable electronic device," and the applicants never disagreed with that characterization.  Ex. D, 3/19/07 Response to Office Action, at 9 – 10; Ex. N, 06/26/06 Office Action, at 2-6; Ex. H, 2/27/07 Office Action, at 2-4, 6-7; Ex. O, 11/27/06 Reply to Office Action, at 11-19; Ex. D, 3/19/07 Response to Office Action, at 9-11.

Affinity argues that the prosecution history of the '833 Patent created a "clear, definitional statement that restricts the meaning of 'portable electronic device' to mobile (*i.e.,* handheld) devices."  Pltf. Br. at 33.  This assertion rests upon the applicants' statement that "Portable electronic devices are well known in the art of electronics as devices or systems that may allow a user to operate a device, for example, in a mobile environment independent or untethered to another system."  *Id.* at 33 (quoting Ex. L, 11/1/05 Amendment, at 17).  However, the applicants never defined or tried to distinguish the claimed "portable electronic device" as being handheld.  The examiner's rejection was based, in part, on the cited prior art's disclosure of a music server, which the examiner said was the "portable electronic device."  In addition to the sentence quoted by Affinity, the applicants also stated:

> Servers 102 and 102A disclosed by Lau do not provide or suggest use that is independent of an automobile or disclose or suggest providing power to servers 102 and 102A independent of an automobile's power supply.  As such, it is unclear how servers 102 and 102A would have utility outside of an automobile as Lau fails to disclose, or suggest, the limitation of 'portable electronic device operable to be used independent of the audio system' as recited in claim 1.

Ex. L, 11/1/05 Amendment, at 17.  As discussed above and as this passage shows, the applicants' arguments related to the utility of an electronic device to operate independently or untethered to another system, not that the device had to be handheld as Affinity contends in its opening brief.

<u>Other Intrinsic Evidence and Extrinsic Evidence</u>:  Other intrinsic evidence, such as the prior art cited in the '833 Patent, further confirms that Defendants' proposed construction is proper, and that Affinity has no basis for arguing that "CD player" and "laptop computer" should not be included in the construction of "portable electronic device."   For example, U.S. Patent No. 6,396,769 to Polany states that "portable audio players" include "compact disc, minidisk, and mp3 players."  Ex. S, 1:20 – 22.

Extrinsic evidence also shows that the Defendants' proposed construction is consistent with what the state of the art at the relevant time considered to be a "portable electronic device." For example, U.S. Patent No. 6,639,584 to Li, which issued on October 28, 2003, describes "portable electronic devices" as including "portable radios, CD-players, voice recorders, and cassette tape players."  Ex. T, 1:14 – 17.

In addition, a laptop computer was well known in the art at the time to be a portable electronic device, as demonstrated by the *Computer Docking* case cited by Plaintiff.  Pltf. Br. at 33.  The Federal Circuit construed the term "portable computer" in part as a computer that is "capable of being moved about," not as a "handheld" computer. 519 F.3d at 1375.  Moreover, in *Computer Docking*, the claim was construed to mean computers "without a built-in display or keyboard" because during prosecution in 1992 the patentee specifically distinguished the claimed portable computer from laptops.  *Id.* at 1375 – 78.  In other words, absent a disclaimer one of ordinary skill in the art would have understood the claimed "portable computer" to cover a laptop.  Here, for the same reason one of ordinary skill in the art would have understood the claimed "portable electronic device," which the specification states may be a "portable computing device," to include a laptop.  '833 Patent, 11:40-42.

Thus, in view of the '833 patent specification, the prosecution history, the prior art cited in the '833 patent, and the extrinsic evidence, "portable electronic device" should be construed as "an electronic device that is transportable, such as, for example, a portable digital assistant (PDA), MP3 player, CD player, cellular phone, or laptop computer."

### C.    Claim Terms Relating to The Characteristics and Processing of an Audio File

#### 1.    "Preprogrammed Soft Buttons" (Claims 1, 17, and 28)

| Defendants' Construction | Volkswagen's Construction | Affinity's Construction |
|---|---|---|
| "preprogrammed soft buttons" - software-rendered graphical buttons created by the user to customize the display | "soft buttons" are simulated buttons, or physical buttons that serve different functions at different times. "preprogrammed soft buttons" are soft buttons, the display of which has been customized by the user. | "preprogrammed soft buttons that are linked to respective audio information sources" - selectable graphics that each represent a preprogrammed name associated with a particular audio file saved in the memory of the portable electronic device and are linked to that audio file. |

The intrinsic record supports Defendants' construction of the term "preprogrammed soft buttons."  Moreover, when properly construed, the term "preprogrammed soft buttons" is consistent with and makes clear the language that follows in this claim element, thus negating the Court's need to construe the additional phrase "that are linked to respective audio information sources," as urged by the Plaintiff.

Initially, although Plaintiff's construction appears to define a "soft button" as any "selectable graphic," Plaintiff concedes in its opening brief that a "soft button" is a software–rendered "button" as proposed by Defendants.  Pltf. Br. at 13.[8]  Thus, Plaintiff and Defendants appear to dispute two points: (1) whether "preprogrammed" means created by the user to customize the display and (2) whether "respective audio information sources" should be limited to audio files saved in the memory of the portable electronic device as proposed by Plaintiff.

      a.      **"Preprogrammed" means "Created by the user to customize the display."**

---

[8] Defining "soft button" as a software-rendered graphical button is required by the intrinsic record.  For example, Fig. 4 of the specification describes the graphics of the radio dial 412 as "buttons," whereas other selectable graphics (*e.g.*, the links shown at 411) are not described as buttons.  The applicant confirmed during prosecution that the graphical buttons shown in radio dial 412 are "soft station buttons."  Ex. I, July 6, 2007 Response to Office Action at 9. Moreover, as the "soft buttons" are part of "the graphical user interface" in the claims, it follows that they are software–rendered *graphical* buttons.

Claim language:  Defendant's proposed construction is consistent with the claim language while the Plaintiff's proposed construction is not consistent with the claim language.  In the term "preprogrammed soft buttons," the word "preprogrammed" modifies the words "soft buttons."  As claimed, the term "preprogrammed soft button" requires that the software-rendered "buttons" be "preprogrammed."  Because the term "soft buttons" itself requires that the button be software-rendered, and hence the result of software programming, the claim is unclear as to what the term "preprogrammed" adds to the term "soft buttons" and what about these software-rendered graphical buttons is "preprogrammed."  Thus, reference to the specification and prosecution history is necessary and appropriate.

Specification:  The specification describes the programmable soft buttons of radio dial 412 as being user created in order to customize the displayed graphical user interface ("GUI"):

> However, radio dial **412** surpasses the limitations of conventional systems
> through providing a ***programmable*** radio dial of ***user customized*** audio
> information. Radio dial **412** includes several stations that ***may be programmed***
> ***using program interface 413***. The preset stations may include several different
> types of ***user customized*** preset information such as ***user selected*** playlists,
> Internet broadcast stations, [etc.]

'833 Patent 11:17 – 23 (emphasis added).  The patent touts the ability of the *user* to customize the programmable radio dial as an advance over prior art "conventional systems."  This excerpt also explains how the radio dial is programmed: the user customizes the display by selecting which audio information sources will be available on the radio dial and creating (or deleting) soft buttons accordingly.  In this regard, the program interface 413 depicted in Fig. 4 shows that a user programs the user interface by adding or deleting buttons.

Prosecution History:  The term "preprogrammed soft buttons" was first introduced to the claims in a dependent claim (application claim 50) added by amendment on March 19, 2007.  In adding the new claims, the applicants pointed to radio dial 412 of Fig. 4, as support.  The

applicants further explained that, "elements of a given graphical interface may be 'preprogrammable' – allowing a user to customize the display that appears on various electronic devices."  Ex. D, 3/19/07 Reply, at 9.

The PTO rejected these added claims as containing subject matter not described in the specification and therefore failing the written description requirement.  Ex. U, 5/24/07 Office Action, at 2 - 3.  In response, the applicants argued to the examiner that radio dial 412 and program interface 413 of Fig. 4, "deserve[d] special attention" and specifically pointed to the disclosure in Col. 11, lines 18-34, as support for these claims.  Ex. I, 7/6/07 Reply, at 9.  The referenced section of the specification states that "a user's radio dial 412 may be provided" that is "a programmable radio dial of user customized audio information."  '833 Patent, 11:18 – 20.  The specification further provides a mechanism, "program interface 413," for the user to program the "several stations" of radio dial 412 and that the "preset stations may include several different types of user customized preset information."  *Id.* 11:21 – 22.  Thus, the only portion of the specification that the applicants argued as describing the "preprogrammed soft buttons," require the user to define radio dials or "buttons" to customize the graphical user interface.  Defendants' proposed construction is consistent with the prosecution history's adoption of that disclosure as defining "preprogrammed" – namely, that the software-rendered graphical buttons are created by the user to customize the display.

Moreover, the applicants expressly limited their invention during the prosecution of the '833 patent and argued that the radio-dial 412 is "user-defined" and that "radio-dial 412 was specifically described as a customizable user interface application that can be communicated to and used by several different types of electronic devices."  Ex. I, 7/6/07 Reply to Office Action, at 8 – 9.  "The user is allowed to create and update a menu of named links (depicted as soft

station buttons in radio dial 412)." *Id.*  Likewise, as stated above, applicants argued that the "elements of a given graphical interface may be 'programmable' – allowing the user to customize the display that appears on various electronic devices."  Ex. D, 3/19/07 Reply, at 9 – 10 (further arguing that this "limitation, and others as well, are missing from the cited art.").  The applicants further argued that because these radio dial buttons are created or defined by the user to customize the display, the "graphical interface of music choices [] can be shown on display of several different types of electronic devices allow[ing] a user to be familiar with and to comfortably navigate through the selected songs from the different types of devices." *Id.*  These statements made by the applicants during the prosecution of the '833 Patent further support Defendants' proposed construction that the "preprogrammed soft buttons" are software rendered graphical buttons created by the user to customize the display.

The intrinsic record shows that the adjective "preprogrammable" means something that the user is able to create.  It follows that the adjective "preprogrammed," the same word in the past tense, is something *previously created* by the user.  Plaintiff acknowledges the effect of the past tense in "preprogrammed":  "Moreover, the claim term 'preprogrammed' is in the past tense – *i.e.*, by that by the time the soft button is presented in a GUI on the separate electronic device, the programming relating to that soft button … has already occurred."  Pltf. Br. at 14.

Thus, Defendants' proposed construction for "preprogrammed soft button" – software-rendered graphical buttons created by the user to customize the display – is consistent with the claim language, the specification and the prosecution history and is therefore correct.

In contrast, Plaintiff's proposed construction – "selectable graphics that each represent a preprogrammed name associated with a particular audio file…" – contradicts and attempts to rewrite the claim language by incorrectly identifying the noun in the claim element that is

32

"preprogrammed."  Under Plaintiff's proposed construction, it is the "name associated with a particular audio file," that is "preprogrammed," and not the "soft buttons" or software-rendered graphical buttons, as recited in the language of the claim.  Plaintiff's proposed construction does not define the "selectable graphics" as preprogrammed, but only that they are a "representation" of the preprogrammed name, which is inconsistent with the claim language and unsupported by the specification or the prosecution history and should therefore be rejected.

Moreover, as shown above, the claim language, the specification and the prosecution history all make clear that these soft buttons are created by the user to customize the display. Defendants are not proposing that the "user must create the *particular graphics* associated with the soft button," only that the user must "create" or define the software-rendered graphical buttons by using, for example, the "program interface 413," to customize the display.  *See, e.g.,* '833 Patent, 11:21 – 22.  In other words, in the claimed invention the user has chosen which audio information sources are displayed in the form of soft buttons.  In contrast, Plaintiff's construction is incorrect because it does not require that the user have preprogrammed the soft button, even though Plaintiff acknowledges that the applicants defined "preprogrammable" as "allowing the user to customize the display."  *See* Pltf. Br. at 17.  In fact, because Plaintiff's construction itself contains the word "preprogrammed," Plaintiff's construction fails to define that term and provides no clarity to the jury as to what it means.

> **b.**    **". . . that are linked to respective audio information sources."**

Claim language:  Defendants did not propose a construction for the remainder of this phrase because the meaning is plain:  The preprogrammed soft buttons are linked to respective (*i.e.*, separate) audio information sources.  Plaintiff essentially seeks to rewrite the independent claims by adding the italicized language:  "…that are linked to respective audio information

sources *which are audio files saved in the memory of the portable electronic device*." That

additional language, however, is already present in *dependent* claims 16, 30, and 32:

> 16. The system of claim 1, wherein the other portion of software is further configured to communicate a collection of information to the different electronic device via the physical interface such that the user can utilize the different electronic device to select ***an audio information source that is an audio file saved in the memory***.

> 30. The system of claim 28, wherein the plurality of preprogrammed soft buttons are all viewable on the associated display at the same time ***and the respective audio information sources are separate files saved in the memory***.

> 31. The system of claim 30, wherein the associated display is a touch screen display and the touch screen display is the user interface mechanism.

> 32. The system of claim 31, wherein the user interface mechanism allows the user to navigate through a plurality of ***audio files saved in the memory*** and to select the audio file for processing.

(emphasis added).  The doctrine of claim differentiation creates a presumption that independent

claims are broader than dependent claims.[9]  Thus, the audio files are saved in the portable

electronic device's memory in one embodiment, specifically claimed in dependent claims 16, 30,

and 32, but the independent claims are broader and cover embodiments where the audio files are

stored elsewhere (for example, at the separate electronic device).  Furthermore, although not

explicitly claimed, nothing in the independent claims prevents the separate electronic device

from having its own memory operable to store audio files.

    Specification:  Plaintiff's construction reads out embodiments in the specification.

Plaintiff points to Figs. 5A and 5B as examples of the claimed connection between a portable

electronic device and a separate electronic device.  Pltf. Br. at 5.  The specification's description

---

[9] *Phillips*, 415 F.3d at 1314-15 (noting that "[t]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claims" and that "[d]ifferences among claims can also be a useful guide in understanding the meaning of a particular claim terms").

of these figures includes embodiments where the audio file is stored at the separate electronic device rather than the portable electronic device:

> In one embodiment the automobile may include memory operably associated with the automobile for storing information. The memory may be used in association with mount **511** and electronic device **512** to store the selected audio information. In this manner, voluminous audio information can be stored within the memory allowing electronic device **512** to receive additional information.

'833 Patent, 12:38 – 44; *see also id.* 12:8-16 (similar description for Fig. 5A).  Accordingly, the specification does not support a construction where the available audio file must be stored in the portable device's memory.

<u>Prosecution history</u>:  Simply put, nowhere in the prosecution history did the applicants disclaim the embodiments where the audio file is located somewhere other than the portable device's memory.  Plaintiff cites no statements in the prosecution history where the applicant disclaims the embodiments discussed above, nor does Plaintiff advance any argument or cite any evidence to rebut the presumption that the independent claims are broader than dependent claims 16, 30, and 32.  Plaintiff's construction contradicts what one of ordinary skill would understand from reading the patent and its prosecution history and is wrong as a matter of law.

### 2.    **"To associate the audio file with a name" (Claims 17 and 28)**

| Defendants' Construction | Affinity's Construction |
|---|---|
| To create a link between the audio file and a name. | See above for the construction of "name."  Affinity believes the remaining terms do not require construction. |

In claims 17 and 28, software on the portable electronic device associates an audio file that is saved in the device with a name, in order to perform the remaining steps of each claim. Defendants accordingly seek a construction of the phrase "to associate the audio file with a name" in order to help the jury navigate the multi-layered language of the claims.  In particular, the verb "to associate," in the context of the operation of computer software, may not be readily

understood by the jury – and so Defendants' construction will be helpful in applying the elements of the claimed invention to the accused devices.

Indeed, Affinity's brief shows the need for a construction of the phrase.  Affinity urges that the phrase "means exactly what it says – an audio file (e.g., the 0's and 1's that constitute a digital representation of a song stored in the memory of the portable device) is associated with a name (e.g., a title)."  Pltf. Br. at 19.  However, nothing in the phrase tells an average juror that an audio file is a "digital representation of a song," let alone that is comprised of binary software code.  And of course, Affinity's response dodges the question of what the verb "to associate" *means* in the context of operation of computer software – a question that Defendants' construction answers.  The construction proposed by Defendants is also consistent with the claims themselves and the salient intrinsic and extrinsic evidence, as follows.

Claim Language:  Claims 17 and 28 require that software, which is stored on the portable electronic device, associates an audio file in that device's memory with a name.  Each claim specifically states that "software stored at the portable electronic device" is "configured to direct the portable electronic device to save an audio file in the memory, *to associate the audio file with a name*."  '833 Patent, 19:50 – 53, 20:50 – 53 (emphasis added).  Thus, the language and structure of the claims makes clear that the portable electronic device is associating an audio file with a name.  To use Defendants' construction, the portable electronic device is "creating a link" between the audio file and name.

Affinity contends that the verb "to create" is not grounded in the claim language.  Pltf. Br. at 20.  That is incorrect:  As noted above, the language and structure of the claims make clear that it is the software on the portable electronic device that creates the association between (i.e., "associates") the audio file stored in the portable device and a name.  In short, no association

exists between the audio file and the name until the software on the portable device creates one.[10]
Affinity attempts to evade a construction by using the passive voice – an audio file "*is associated*
with a name," Pltf. Br. at 19 (emphasis added) – to imply that an association can already exist
and that the software on the portable device is not required to create the association.  The claim
language does not support this position.  Rather, the claims make clear that software stored on
the portable device is configured "to associate the audio file with a name" – *i.e.*, the software
creates the association.

        <u>Prosecution History</u>:  During prosecution, the applicants themselves defined the phrase
"to associate an audio file with a name" as requiring the creation of a link between the file and
name.  In May 2007, the Examiner rejected all pending claims for lack of written description
pursuant to Section 112, paragraph 1, and in so doing noted that all of the then-pending
independent claims "disclose a portable electronic device displaying a graphical interface item
*comprising a name associated with an audio file*."  Ex. U, 5/24/07 Office Action, at 2 – 3
(emphasis added).  To overcome that rejection, the applicants forcefully argued that their
application taught and suggested "the existence of a graphical interface item that:  (1) *links a
name to an audio file*."  Ex. I, 7/6/07 Response to Office Action, at 8 – 9 (emphasis added). In
short, the applicants themselves defined "to associate" to mean "to create a link," and the
Defendants are simply using that precise portion of the prosecution history to construe the phrase
"to associate the audio file with a name."

---

[10] Affinity argues in passing that it is the graphical interface item, not the portable electronic
device, "that 'links' the name to the audio file."  Pltf. Br. at 22.  Affinity misses the point:  It is
software stored on the portable electronic device that must be configured to associate the audio
file with a name.

Extrinsic Evidence:  To the extent the Court wishes to consider extrinsic evidence, the Defendants have proffered both technical and everyday dictionaries supporting their proposed construction.  The Fifth Edition of Computer Dictionary defines the verb "associate" using the equivalent verb "link":  "To inform the operating system that a particular file name extension *is linked* to a specific application."  *See* Ex. V.  Everyday dictionaries also define the verb "associate" to mean "to connect or join together; combine; *link*."  Ex. W, The American Heritage Dictionary 135 (2d ed. 1982).[11]

### 3.   "To select an available audio file for processing" (Claims 17 and 28)

| Defendants' Construction | Affinity's Construction |
|---|---|
| Does not require construction. | To select an available audio file for converting into an audio signal. |

Defendants contend that this phrase – "to select an available audio file for processing" – does not require construction because it will be understood by a jury.  Plaintiff proposes a construction that is identical to the claim language except that it replaces the word "processing" with a phrase that identifies one particular type of processing: "converting into an audio signal."  Nothing in the claims, specification, or prosecution history supports restricting "processing" to only "converting into an audio signal."  Indeed, the specification describes several ways to process audio files.  Accordingly, Plaintiff's narrow construction must be rejected.

Claim Language:  In claims 17 and 28, software at a portable electronic device is configured to communicate a collection of information to a second electronic device.  This

---

[11] Plaintiff has also proffered a proposed construction for the isolated term "name."  Pltf. Br. at 18 – 22.  Defendants believe that the jury will readily understand what a "name" is, and so the term does not require construction.  Plaintiff's lengthy proposed construction, when substituted for "name" into the multi-layered claims, also renders those claims even more unwieldy – making it unlikely that the construction will aid the jury.

collection of information, among other things, allows a user of the second electronic device to select an available audio file for "processing."  The claim language does not limit "processing" in any way, and Affinity has not really argued that it does.  Instead, Affinity notes in its Brief that "[t]he structure of claims 17 and 28 makes clear that a user can interact with the GUI on the separate electronic device to navigate through the audio files saved on the portable electronic device and select an audio file to be converted into an audible signal."  Pltf. Br. at 23.  This statement is correct, as far as it goes:  that is one way that a user can interact with the second electronic device.  But it does not follow that this is the *only* way that a user can choose to process an available audio file.

Specification:  The specification expressly describes several ways in which an audio file may be processed:

> In another embodiment, the method of FIG. 8 may be modified to allow a user to manipulate song post download. For example, **a user may want to *store, delete, replay, copy, forward, etc*. received audio information**. Therefore, the method of FIG. 4 may be modified such that a user can manipulate or ***process the received audio information in a plurality of ways***.

'833 Patent, 17:10-16 (emphasis added).  Thus, the specification specifically describes (1) receiving audio information at an electronic device and (2) using the electronic device to process the audio information in a "plurality of ways," just as in claims 17 and 28.  Several of the identified ways to process the audio file do not involve converting an audio file into an audio signal (*e.g.*, copying, forwarding, deleting, and so on).  Affinity failed to address this portion of the specification in its brief and instead wrongly asserts that the intrinsic record as "exclusively" and "unequivocally" supports its proposed narrow construction.  Pltf. Br. at 23, 25.  All of the portions of the specification cited by Affinity merely state that an electronic device *may* be operable to play audio files in some embodiments.  '833 Patent, 8:10-17 ("In *one* embodiment … electronic device *may also* include an MP3 player operable to process the received information

39

into an audio signal."); *see also* 17:52 – 633.   Yet Affinity's construction would turn "may" into "must" and read out all other described embodiments where the electronic device processes audio information in other ways.

Prosecution History:  The prosecution history is in accord with the claims and specification.  The prosecution history contains discussions of an embodiment where a user selects an audio file to listen to it.  *See* Pltf. Br. at 24 – 25.  The prosecution history contains no statements, from the applicant or examiner, suggesting that the claimed processing of audio files should be limited to *solely* this embodiment.  In sum, the claims are not limited to an embodiment where converting an audio file into an audio signal is the only type of processing possible, just as they do not limit processing to deleting, copying, forwarding, or the other methods of processing audio files also described in the specification.

Defendants believe that the Court need not construe this term for three reasons.  First, "processing" is an ordinary word that jurors can understand, and construing "processing" will not provide any additional clarity for the jury.  Second, the specification lists several examples of ways audio information can be "process[ed]," but that list is non-exhaustive, so defining "processing" by listing specific methods of processing would not fully encompass the broad meaning of this term consistent with the specification.  *See* '833 Patent, 17:13 (disclosing that a user can "store, delete, replay, copy, forward, etc." audio information).  Third, by declining to construe "processing," the Court will resolve the parties' dispute over the term's meaning.

## CONCLUSION

For the foregoing reasons, Defendants' proposed constructions should be adopted.

Dated:   September 10, 2009                    Respectfully submitted,


                                               */s/ Diane V. DeVasto*
                                               *(on behalf of all Defendants)*
                                               Diane V. DeVasto
                                               State Bar No. 05784100
                                               dianedevasto@potterminton.com
                                               Michael E. Jones
                                               State Bar No. 10929400
                                               mikejones@potterminton.com
                                               POTTER MINTON, P.C.
                                               110 N. College Avenue, Suite 500
                                               Tyler, Texas 75702
                                               Telephone:     (903) 597-8311
                                               Facsimile:     (903) 593-0846


                                               David M. Schnorrenberg
                                               dschnorrenberg@crowell.com
                                               John L. Cuddihy
                                               jcuddihy@crowell.com
                                               CROWELL & MORING, LLP
                                               1001 Pennsylvania Avenue, N.W.
                                               Washington, DC 20004-2595
                                               Telephone:     (202) 624-2500
                                               Facsimile:     (202) 628-5116

                                               **ATTORNEYS FOR DEFENDANTS
                                               MERCEDES-BENZ U.S.
                                               INTERNATIONAL, INC. AND
                                               MERCEDES-BENZ USA, LLC**

S. Calvin Capshaw
State Bar No. 03783900
ccapshaw@capshawlaw.com
Elizabeth L. DeRieux
State Bar No. 05770585
ederieux@capshawlaw.com
Capshaw DeRieux, LLP
1127 Judson Road, Suite 220
Longview, TX 75601
Tel: 903-233-4826
Fax: 903-236-8787

Joseph P. Lavelle
Lavellej@Howrey.com
Vivian Kuo
Kuov@Howrey.com
Christopher Cuneo
CuneoC@Howrey.com
Howrey LLP
1299 Pennsylvania Ave
Washington, DC 20004
Tel: 202-383-6931
Fax: 202-383-6610

**ATTORNEYS FOR DEFENDANTS
BMW OF NORTH AMERICA, LLC and
BMW MANUFACTURING COMPANY
LLC**

Steven M. Zager - Lead Attorney
szager@akingump.com
AKIN GUMP STRAUSS HAUER &
FELD, LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Fax: (212) 872-1002

Jin-Suk Park
jspark@akingump.com
Amanda R. Johnson
arjohnson@akingump.com
AKIN GUMP STRAUSS HAUER &
FELD, LLP
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

Thomas D. Fortenberry
tfortenberry@akingump.com
AKIN GUMP STRAUSS HAUER &
FELD, LLP
300 West 6th Street, Suite 2100
Austin, TX 78701-3911
Telephone: (512) 499-6200
Facsimile: (512) 499-6290

**ATTORNEYS FOR DEFENDANTS
COUNTERCLAIMANTS HYUNDAI
MOTOR AMERICA, HYUNDAI
MOTOR MANUFACTURING
ALABAMA, LLC, and KIA MOTORS
AMERICA, INC.**

Jeffrey S. Patterson
State Bar No. 15596700
jpatterson@hdbdk.com
Thomas J. Adair
State Bar No. 24047753
tadair@hdbdk.com
Hartline, Dacus, Barger,
Dreyer & Kern LLP
6688 N. Central Expy., Suite 1000
Dallas, TX 75206
Tel: 214-346-3701
Fax: 214-369-2118

Reginald J. Hill
(admitted *pro hac vice*)
rhill@jenner.com
Peter J. Brennan
(admitted *pro hac vice*)
pbrennan@jenner.com
Gregory A. Lewis
(admitted *pro hac vice*)
glewis@jenner.com
Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL 60611-7603
Tel:  312-923-9350
Fax:  312-923-0484

**ATTORNEYS FOR DEFENDANT
NISSAN NORTH AMERICA, INC.**

Deron R. Dacus
Texas State Bar No. 00790553
RAMEY & FLOCK, P.C.
100 East Ferguson, Suite 500
Tyler, TX 75702
Tel.: (903) 597-3301
Fax: (903) 597-2413
derond@rameyflock.com

Michael J. Lennon
Susan A. Smith
Georg C. Reitboeck
KENYON & KENYON LLP
One Broadway
New York, NY 10004-1007
Tel.: (212) 425-7200
Fax: (212) 425-5288

**ATTORNEYS FOR DEFENDANT
VOLKSWAGEN GROUP OF
AMERICA, INC.**

Steven J. Routh (D.C. Bar # 376068)
Sten Jensen (D.C. Bar # 443300)
T. Vann Pearce, Jr. (admitted *pro hac vice*)
Orrick, Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005
Telephone: 202-339-8436
Facsimile: 202-339-8500
Email: srouth@orrick.com
sjensen@orrick.com
vpearce@orrick.com

William H. Wright (Cal. Bar # 161580)
Orrick, Herrington & Sutcliffe LLP
777 South Figueroa Street
Suite 3200
Los Angeles, CA 90017
Telephone: 213-612-2478
Facsimile: 213-612-2499
Email: wwright@orrick.com

**ATTORNEYS FOR DEFENDANTS
KENWOOD USA CORPORATION AND
JVC AMERICAS CORP.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on September 10, 2009.  Any other counsel of record will  be served by First Class U.S. mail on this same date.

*/s/ Diane V. DeVasto*
Diane V. DeVasto